**BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., et al., Plaintiffs,**

v.

**PHILIP MORRIS, INCORPORATED, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Liggett Group, Inc., Lorillard Tobacco Company, British American Tobacco, Ltd. Defendants.**

No. 98 CV 3287(JBW).

United States District Court, E.D. New York.

Oct. 19, 2001.

Dewey Ballantine LLP, New York, NY, By Paul J. Bschorr, Esq., Vincent R. Fitz-Patrick, Jr., Esq., Michael Hefter, Esq., Heather K. McDevitt, Esq., Dewey Ballantine LLP, Washington, DC, By Martha J. Talley, Esq., for Plaintiffs Blue Cross, et al.

Arnold & Porter, Washington, DC, By Murray R. Garnick, Esq., Sedgwick, Detert, Moran & Arnold, San Francisco, CA, By Kevin J. Dunne, Esq., Sedgwick, Detert, Moran & Arnold, New York, By James T. Conlon, Esq., for Defendant Philip Morris, Incorporated.

Sedgwick, Detert, Moran & Arnold, New York, By David M. Covey, Esq., Kirkland & Ellis, Washington, DC, By Kenneth N. Bass, Esq., for Defendant Brown & Williamson Tobacco Corporation.

Greenberg Traurig, LLP, New York, By Alan Mansfield, Esq., Shook, Hardy & Bacon, LLP, Kansas City, MO, By Gary R. Long, Esq., for Defendants Lorillard Tobacco Company, Lorillard, Inc.

Debevoise & Plimpton, New York, By Steven Klugman, Esq., for Defendant Council for Tobacco Research, U.S.A., Inc.

Jacob, Medinger & Finnegan, LLP, New York, By Barry S. Schaevitz, Esq., for Defendant Smokeless Tobacco Council, Inc.

Womble, Carlyle, Sandridge, & Rice, PLLC, Atlanta, GA, By R. Dal Burton, Esq., Womble, Carlyle, Sandridge, & Rice, PLLC, Winston–Salem, North Carolina, By Thomas D. Schroeder, Esq., Ursula M. Henninger, Esq., Collier, Shannon, Rill, & Scott, PLLC., Washington D.C., By John B. Williams, Esq., for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Chadbourne & Parke LLP, New York, By Thomas J. McCormack, Esq., for Defendant British American Tobacco (Investments) Limited (formerly known as British–American Tobacco Company Limited).

Simpson Thacher & Bartlett, New York, By Joseph McLaughlin, Esq., for Defendant BAT Industries P.L.C.

Davis & Gilbert, LLP, New York, By Bruce M. Ginsberg, Esq., for Defendant Hill & Knowlton, Inc.

Kasowitz, Benson, Torres & Friedman LLP, New York, By Leonard Feiwus, Esq., for Defendants Liggett Group Inc., Liggett & Myers, Inc., and Brooke Group Ltd.

Seward & Kissel, New York, By Anthony R. Mansfield, Esq., for Defendant The Tobacco Institute, Inc.

*AMENDED MEMORANDUM & ORDER*

WEINSTEIN, Senior District Judge.

Table Of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

II. The Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

III. Rule 50(b) Motion to Set Aside the Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

IV. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

 A. Evidence of Medical Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

 1. Smoking causes cancer and other disease . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

 2. Smoking aggravates medical costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

 B. Evidence of Deceptive Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

 1. Defendants denied causation despite contrary evidence in internal documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

 a. Public statements from the 1950s to the present . . . . . . . . . . . . . . . . . 216

 b. Knowledge from the 1950s to the present . . . . . . . . . . . . . . . . . . . . . . . 219

 2. Defendants funded scientific studies to discredit scholarship demonstrating causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

 3. Defendants suppressed the development of new safer products to intercept quitters and to dispel appearance that their products were unsafe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

 4. Defendants covered-up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

 C. Evidence that Deceptive Practices Caused Consumers and Plaintiff Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

 1. Evidence that defendants knew the public would act upon deceptive practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

 2. Evidence that defendants' misrepresentations caused consumers and plaintiff damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

 a. Expert testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

 i. Dr. Jon Krosnick . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

 ii. Dr. Jeffery Harris and others . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

 b. Videotaped depositions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

 c. Surveys, medical and psychological literature, and other documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

V. Remoteness Under New York's Consumer Protection Act . . . . . . . . . . . . . . . . . . . .230

 A. Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .230

 B. Legislative Design and History of New York General Business Law
 Section 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .231

 C. General History of Consumer Protection Statutes . . . . . . . . . . . . . . . . . . . . .237

 1. Modern consumer protection acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .239

 2. State consumer statutes permitting indirect injuries . . . . . . . . . . . . . . . .240

 D. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .242

 1. "Remoteness" does not bar plaintiff's claims under section 349 . . . . . . . .243

 2. Plaintiff has standing to sue under section 349 . . . . . . . . . . . . . . . . . . . . .245

VI. Subrogation Under Section 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .245

VII. Individualized Proof of Causation and Damages . . . . . . . . . . . . . . . . . . . . . . . . . . .247

 A. Federal Rules of Civil Procedure and Evidence . . . . . . . . . . . . . . . . . . . . . . . .249

 B. Appropriateness of Sampling and Survey Techniques . . . . . . . . . . . . . . . . . . .250

 1. Due process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .253

 2. Seventh amendment jury trial rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . .255

 3. Erie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .259

VIII. Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .262

 A. Preemption Under Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .262

 B. State Regulatory Compliance Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .265

IX. Evidence Sufficient to Support Low Tar Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . .266

 A. Evidence Admissible to Support General Deception . . . . . . . . . . . . . . . . . . . .267

 B. Evidence Admissible to Support Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . .268

X. Evidence of Post–1980 Deceptive Acts and Practices . . . . . . . . . . . . . . . . . . . . . . . .268

 A. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .268

 B. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .269

XI. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .271

 A. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .271

 B. Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .273

XII. Sufficiency of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .273

A. Law ................................................................. 274

B. Application ......................................................... 274

XIII. Conclusion ......................................................... 275

I. Introduction

This is one of the many suits designed to make cigarette companies pay for the enormous medical problems created by their product. Plaintiff has developed a new road to recovery via New York's Consumer Protection statute. The primary question now posed is one of law: Does section 349 of New York's General Business Law, designed to protect consumers against fraud, support a recovery by a health insurer whose costs were increased by the fraud. For the reasons set out below, section 349:(1) makes defendants liable for frauds the jury has found they committed against smokers; and (2) permits plaintiff to recover for the extra medical costs that it absorbed on behalf of its clients caused by their fraud induced smoking.

A jury verdict found defendants liable for a violation of section 349 of New York's General Business Law, causing some $17,000,000 in damages to plaintiff. Plaintiff seeks a judgment for the jury award, post verdict interest, costs and disbursements under the Federal Rules of Civil Procedure and attorney's fees under section 349. Defendants move to dismiss on the ground that no cause of action was proved.

Plaintiff is entitled to retain its jury award and to obtain interest from the day of that award. Plaintiff's motion for statutory attorney's fees under section 349 and costs and disbursements under Rule 54(d) of the Federal Rules of Civil Procedure will be covered in a separate memorandum. Defendants' motion for judgment is denied.

The series of related litigations in this court against defendants have been extensively described; the rulings in these matters are made a part of this memorandum. See *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 2001 WL 811930 (E.D.N.Y. May, 22, 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 141 F.Supp.2d 320 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 138 F.Supp.2d 357 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 133 F.Supp.2d 162, 167; *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 199 F.R.D. 487 (E.D.N.Y.2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 199 F.R.D. 484 (E.D.N.Y. 2001); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 113 F.Supp.2d 345 (E.D.N.Y.2000); *Blue Cross & Blue Shield of N.J. v. Philip Morris Inc.*, 53 F.Supp.2d 338 (E.D.N.Y.1999); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 36 F.Supp.2d 560 (E.D.N.Y.1999); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, No. 98 CV 3287, 1999 WL 104815 (E.D.N.Y. Feb. 25, 1999); *see also Simon v. Philip Morris Inc.*, 200 F.R.D. 21 (E.D.N.Y.2001); *Simon v. Philip Morris Inc.*, 124 F.Supp.2d 46 (E.D.N.Y.2000); *Simon v. Philip Morris Inc.*, No. 99 CV 1988, 2000 WL 1658337 (E.D.N.Y. Nov.6, 2000); *Simon v. Philip Morris Inc.*, 194 F.R.D. 73 (E.D.N.Y.2000); *Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95 (E.D.N.Y.2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 2001 WL 477256 (E.D.N.Y. Feb.27, 2001); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, No. 98 CV 1492,

2000 WL 1424931 (E.D.N.Y. Sept.26, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, No. 98 CV 1492, 2000 WL 1364358 (E.D.N.Y. Sept.20, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, No. 98 CV 1492, 2000 WL 777834 (E.D.N.Y. June 13, 2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 86 F.Supp.2d 137 (E.D.N.Y.2000); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 71 F.Supp.2d 139 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 74 F.Supp.2d 221 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 74 F.Supp.2d 213 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, 23 F.Supp.2d 321 (E.D.N.Y.1998); *Nat'l Asbestos Workers Med. Fund v. Philip Morris Inc.*, No. 97 CV 1492, 1998 WL 372410 (E.D.N.Y.1998); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1880303 (E.D.N.Y. Dec.27, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1880305 (E.D.N.Y. Dec.27, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1804542 (E.D.N.Y., Dec.4, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1804602 (E.D.N.Y. Nov.30, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1737941 (E.D.N.Y. Nov.21, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1370437 (E.D.N.Y.,Sept.21, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1336697 (E.D.N.Y. Sept.15, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1292671 (E.D.N.Y. Sept.8, 2000); *Falise v. Am. Tobacco Co.*, 107 F.Supp.2d 200 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1144697 (E.D.N.Y. July 25, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1010982 (E.D.N.Y. July 19, 2000); *Falise v. Am. Tobacco Co.*, No. CV 99–7392, 2000 WL 1010978 (E.D.N.Y. July 18, 2000);

*Falise v. Am. Tobacco Co.*, 94 F.Supp.2d 316 (E.D.N.Y.2000); *Falise v. Am. Tobacco Co.*, No. 99 CV 7392, 2000 WL 433097 (E.D.N.Y. Apr 18, 2000); *Falise v. Am. Tobacco Co.*, 91 F.Supp.2d 525 (E.D.N.Y. 2000); *Falise v. Am. Tobacco Co.*, No. 99 CV 7392, 2000 WL 264332 (E.D.N.Y. Jan. 24, 2000) (No. CV–98–1492, CV–97–7658, CV–98–3287, CV–98–675); *Falise v. Am. Tobacco Co.*, 193 F.R.D. 73 (E.D.N.Y. 2000); *Falise v. American Tobacco Co.*, 241 B.R. 63 (E.D.N.Y.1999); *Falise v. Am. Tobacco Co.*, 241 B.R. 48 (E.D.N.Y.1999); *Falise v. Am. Tobacco Co.*, No. 99 CV 7392, 1999 WL 98626 (E.D.N.Y. Feb. 18, 1999) (No. 97 CV 7640, 97 CV 7658, 98 CV 675); *Falise v. Am. Tobacco Co.*, No. 97– CV–7640, 1998 WL 372401 (E.D.N.Y. July 2, 1998); *Bergeron v. Philip Morris Inc.*, 100 F.Supp.2d 164 (E.D.N.Y.2000); *Bergeron v. Philip Morris Inc.*, No. 99 CV 6142, 2000 WL 748144 (E.D.N.Y. June 8, 2000); *H.K. Porter Co., Inc. v. Am. Tobacco Co.*, 71 F.Supp.2d 73 (E.D.N.Y.1999); *In re Tobacco Litig., E. Dist. of New York*, 193 F.R.D. 92 (E.D.N.Y.2000); *In re Tobacco Litig.*, 192 F.R.D. 90 (E.D.N.Y.2000); *In re Simon (II) Litig.*, No. 00 CV 5332, 2000 WL 1252182 (E.D.N.Y. Sept.6, 2000) (98 CV 0675, 99 CV 6142, 98 CV 1492, 97 CV 7658, 99 CV 1988, 98 CV 3287, 99 CV 7392, 00 CV 4632).

Numerous oral motions and rulings were made during the course of this and a related trial on hearings respecting admissibility of testimony, expert opinions and reports, scientific books and papers and other documents, extensive television and other depositions, and methods of presentation to the jury using modern audiovisual equipment and techniques. There is no point in revisiting these rulings and decisions since briefing and argument on each one was comprehensive; no reason to modify them has been demonstrated. The advanced courtroom technology utilized by

all counsel was helpful to the court and jury; it conformed to standards for fair and effective trials. *See* Federal Judicial Center, *Effective Use of Courtroom Technology* (2001).

It is enough to find that the jury had ample ground to conclude that defendants individually and as a group violated the New York Consumer Protection Act, section 349 of the Business Law, by deliberately misleading people who became clients of plaintiff, causing them to smoke earlier, more, and to quit later, than they would have absent the consumer fraud practiced on them by defendants; that this smoking causes specific diseases and makes treatment of other diseases more expensive; and that plaintiff incurred the extra costs of treating its clients who are or were smokers. Appropriate statistical and expert evidence proved the monetary costs of defendants' violation of Section 349 that were borne by plaintiff. The fact that the jury chose to take the most conservative view of damages suffered by plaintiff is no basis for finding lack of support for its verdict. In short, plaintiff proved that defendants' deliberate distortion of public knowledge about smoking directly resulted in increased medical costs to plaintiff in the amount found by the jury.

## II. The Jury

The jury sat for 44 trial days. It heard 34 witnesses, 10 of whom were *Daubert* screened experts. It had 1,632 demonstratives and exhibits. It viewed over 100 depositions, many of which were of smokers who were clients of the plaintiff. It utilized numerous charts and diagrams that assisted in visualizing the parties' contentions and in understanding the statistical and other evidence.

An extensive questionnaire was used in selecting the jury from the 200 citizens who were called for the case. Jury members were unbiased and intelligent. Members were diverse. Ages ranged from 25 to 68. Some were born and raised in the New York area, while others had immigrated. Most were covered under a health care plan. Some never smoked; others were former or are current smokers. None knew about prior tobacco litigation. None had seen movies or read books related to the tobacco industry. Most jurors were paid by their employers for their time. All of the jury members were both professionally and personally successful. Brief descriptions of the member's varied backgrounds are set out below:

Juror number 1 was a 44 year old male from Suffolk County who was raised in Holbrook, New York. He has a college degree and studied computer programming. As a report analyst, he compiles and distributes statistical reports for management. He spends his spare time with his wife and two children.

Juror number 2 was a 59 year old male from Queens County who was raised in Karnataka, India. He has a post graduate degree and handles complicated financial matters at a major bank. He has been married for 24 years and has two children.

Juror number 3 was a 44 year old male from Suffolk County who was raised in Floral Park, New York. He has a bachelor's degree in Psychology with a minor in Business. He has worked as a postal worker for twenty years and spends his spare time with his immediate family.

Juror number 4 was a 44 year old female who was raised and lives in Brooklyn, New York. She has a high school diploma. She was previously employed as an office manager, and is currently working as a clerk at a quasi-public institution. She has three grandchildren; her daughter works for a law firm.

Juror number 5 was a 49 year old male from Nassau County who was raised in Freeport, New York. He studied architecture in college. He is a postal worker. He has two children and three grandchildren. In his spare time, he bowls and skis.

Juror number 6 was a 62 year old male who was raised and lives in Brooklyn, New York. He has a high school diploma. He is currently retired. He owns a home, has been married for 35 years, and has three college educated children.

Juror number 7 was a 25 year old female from Queens County who was raised in Phelps, New York. She has a bachelor's degree in English. Her position in a film company requires her to read manuscripts and correspond with writers. She has been married for two years, writes screenplays and fiction, and contributes her spare time to a well known community service organization.

Juror number 8 was a 34 year old female who was raised and currently resides in Queens, New York. She received post graduate training and is a physical therapist at a medical center, where she runs clinics for children and treats individuals with neuromuscular diseases and disabilities. She is single, plays the guitar and enjoys karate.

Juror number 9 was a 51 year old female who was raised and currently resides in Queens, New York. She has a high school diploma and is a customer care technology support employee at a major telephone company. She has been married for 27 years and assists her community with kitchen duty for the poor.

Juror number 10 was a 45 year old male who grew up in Brooklyn, New York. He attended college and is an operations specialist for an international securities firm.

Juror number 11 was a 44 year old male from Nassau County who was born in South Carolina. He graduated from college with a degree in Marketing and currently works for a large railroad. He has been married for 19 years and has two children.

Juror number 12 was a 68 year old male from Nassau County who was raised in Naples, Italy. He is a retired machine assembler. One of his children is an accountant and the other is an engineer. He enjoys spending time with his three grandchildren.

The jury was remarkably focused, always on time, always concentrating on the evidence, arguments and instructions. A number of its members took extensive notes. It read and studied the court's written charge as it was delivered and took the charge into the jury room. During its deliberations the jury had all the admitted documents as well as the key depositions. It appeared to take a critical view of much of the expert testimony which would have supported a verdict of hundreds of millions of dollars. After days of deliberations the jury asked for an adding machine. In coming to a conclusion on damages, it obviously made its own analysis of the deposition testimony of witnesses who were smoking clients of the plaintiff, other testimony and the documents. If the law respecting section 349 was properly presented to this jury, its verdict should be sustained.

III. Rule 50(b) Motion to Set Aside the Verdict

■ Defendants move to dismiss pursuant to Rule 50 of the Federal Rules of Civil Procedure. Granting a Rule 50 motion for judgment as a matter of law after verdict is rarely appropriate. *George Basch Co. v. Blue Coral Inc.*, 968 F.2d 1532, 1536 (2d Cir.1992). Judgment as a

matter of law "may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [the opposing party's] favor." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998). Ruling on such a motion, the court must "draw[ ] all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant...." *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir.1999) (internal quotations omitted). Thus, a motion for judgment as a matter of law should not be granted unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant].

*DiSanto v. McGraw–Hill, Inc./Platt's Div.*, 220 F.3d 61, 64 (2d Cir.2000) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998)).

Here, plaintiff adduced sufficient evidence for a jury to find that defendants engaged in a successful scheme to distort the body of public knowledge; that they did so knowing the public, including plaintiff's members, would act upon defendants' statements and omissions; with the foreseeable result that plaintiff and other third-party payors would and did absorb the costs of increased medical services due to smoking resulting from defendants' actionable fraud. The evidence requires denial of defendants' motion for judgment as a matter of law if section 349 supports the verdict.

## IV. Evidence

■ Whatever the viability of plaintiff's claims under federal law and New York state common law, the jury has spoken, finding them unsupported; that decision was supportable and not inconsistent with a finding favoring plaintiff on another theory. The one claim that the jury found was supported by the evidence was that under section 349. Under the rule of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that New York substantive law governs and supports the verdict. Federal procedure and rules of evidence were appropriately applied during the trial. As demonstrated below, the evidence including that at trial in the form of expert testimony and analysis as well as the deposition testimony of plaintiff's members establishes that plaintiff met its burden of proving that defendants' deceptive practices caused it injury.

### A. Evidence of Medical Causation

### 1. Smoking causes cancer and other disease

Plaintiff's evidence demonstrated smoking-related illnesses account for almost one of every five deaths each year in the Unit-

ed States, making cigarette smoking the leading cause of premature death in the United States. Trial Tr. 1150–52; *see* Attachment A below.

Op_10.jpg

There were some relatively small changes between 1990 and 2001. *See* Burns Demo 6 below.

Annually, smoking-related illnesses kill hundreds of thousands of Americans, exceeding the combined deaths caused by automobile accidents, AIDS, alcohol use, illegal drug use, homicide, suicide and

fires. Samet Demo 25 below (There were relatively small relative changes between 1990 and 2001. Burns Demo 6 *supra* ); *see also* Trial Tr. 1090; Trial Tr. 1050–52.

Actual Causes of Death in the U.S. – 1990

3% Toxic agents — 2% Firearms — 1% Sexual behavior — 1% Motor vehicles — <1% Illicit drugs — 4% Microbial agents — 5% Alcohol — 14% Diet/activity — 50% Other

Samet Demo 25

McGinnis JM and Foege WH. *Actual Causes of Death in the United States.* Journal of the American Medical Association. 2207–12, November 10, 1993.

At trial, plaintiff's experts Dr. David Burns and Dr. Jonathan Samet testified that tobacco use is responsible for:

— cancers of the lung, mouth, larynx, esophagus, pancreas, uterus, cervix, kidney and colon;

— pulmonary diseases such as emphysema and bronchitis;

— cardiovascular diseases such as strokes, heart attacks, peripheral vascular disease, and aortic aneurysms; and

— reproduction problems such as reduced fertility, increased rates of miscarriages and stillbirths, retarded uterine fetal growth and lowered infant birth weight.

Trial Tr. at 683–948 (Burns); Trial Tr. at 1104–1241 (Samet).

Dr. Samet testified as to known carcinogens identified in tobacco smoke to date. The 43 carcinogenic agents in cigarette smoke include: arsenic, benzine, cadmium, chromium VI, vinyl chloride, and nickel. *See* Samet Demo 3. Compared to those people who never smoke, current smokers are almost 15 times more likely to develop lung cancer, 12.7 times more likely to develop chronic obstructive pulmonary disease, 7.5 times more likely to develop esophageal cancer, 4.1 times more likely to suffer Ischaemic Heart Disease, 2.2 times more likely to develop pancreatic cancer, and 1.4 times more likely to suffer a cerebral hemorrhage. *See* Samet Demos 11 & 22; *see also* Doll, et. al., *Mortality in Relation To Smoking: 40 Years Observations On Male British Doctors,* 309 British Medical J. 901–11 (1994). All told, carcinogenic chemicals inhaled by persons smoking defendants' products have been linked to 85% of all lung cancer, 80% of deaths from all pulmonary diseases, and 30% of all deaths from other cancers. *See* Samet Demo 25; *see also* J.M. McGinnis & W.H. Foege, *Actual Causes of Death in the United States,* J. of Am. Med. Assoc. 2707–12 (1993).

In addition to causing disease and illness, smoking cigarettes can lead to nicotine addiction. Nicotine is the chemical substance in cigarettes that creates the "high" smokers experience. Once in the blood stream, nicotine is carried almost immediately to the brain where it sets off a series of chemical reactions that alter mood and produce feelings of both sedation and stimulation. Trial Tr. at 1335–36. It also activates the transmission of a natural chemical, dopamine, that generates pleasurable body sensations, and ultimately causes a craving for nicotine delivered by cigarette smoke. *Id.*

So powerful is the addictive force of nicotine that, in the absence of nicotine, the addicted smoker suffers symptoms of physical withdrawal, including headaches, constipation, insomnia, depression, inability to concentrate and anxiety. Trial Tr. at 1343. Nicotine addicts in much the same way as does heroin and cocaine. Trial Tr. at 1329–30 (citing *Health Consequences of Smoking, Surgeon General Report* (1988)). Many smokers are unable to quit until they suffer a heart attack or contract lung cancer, and even then, of those who survive the ordeal approximately one-half will return to smoking.

### 2. Smoking aggravates medical costs

Econometric and other models introduced at trial demonstrated that the health care costs to treat illness associated with smoking are astronomical. According to plaintiff's witness Dr. Wendy Max, plaintiff spent approximately $756 million to treat smoking caused disease since 1994. *See* Max Demo 10. Dr. Glenn Harrison testified that the figure is even higher when the costs associated with treating smokers for non-smoking caused illness were taken into account. Using an econometric model, he testified that the total economic damages to the plaintiff since 1994 were over $985 million dollars. *See* Harrison Demo 12. His calculations showed that a person whose respiratory or cardiovascular system is weakened by smoking would, in general, respond less readily to treatment for other diseases. The fact that a particular smoker might heal more readily than a particular nonsmoker is not decisive; the law of large numbers eliminates the effect of such discrepancies or anomalies. *See* Part VII, *infra; see also* K.E. Warner, T.A. Hodgson, & C.E. Caroll, *Medical Costs of Smoking in the United States: Estimates, Their Validity, and Their Implications*, 9 Tobacco Control, 290–300 (1999) (applying econometric model); J.C. Bartlett, L.S. Miller, D.P. Rice, W. Max, *Medical Care Expenditures Attributable To Smoking: United States*, 43 Morbidity and Mortality Wkly. Rep. 469–72 (1994) (applying econometric model).

The introduction of both models was proper. *See Blue Cross & Blue Shield of N.J. v. Philip Morris Inc.*, No. 98 CV 3287, 2000 WL 1738338 (E.D.N.Y. Nov.1, 2000) (finding both models comply with *Daubert*); *cf. Girden v. Sandals Int'l*, 262 F.3d 195 (2d Cir.2001) ("For purposes of admissibility it is not required that a witness's account of an event be consistent with the same witness's other accounts of the same event."). The evidence supports the conclusion that extra costs result from treating smokers for diseases not caused directly by smoking. While there is no indication that the jury relied upon these damage calculations, the testimony was based on the records of the plaintiff. Both experts were highly qualified to testify; their models were subject to extensive *Daubert* hearings and determined to be consistent with sound scientific norms. *See* Part VII, *infra* (discussing appropriateness of statistical evidence for trial).

### B. Evidence of Deceptive Practices

Evidence demonstrated that defendants took a variety of deliberate and calculated

steps over many decades to misrepresent the health effects of smoking cigarettes.

1. Defendants denied causation despite contrary evidence in internal documents

When significant medical research indicated a statistical relationship between smoking and cancer in the early 1940s and 1950s, defendants embarked on a campaign to discredit this research and reassure the public that their products were safe. Defendants recognized that the publication in the early 1950s of retrospective epidemiological studies showing a link between smoking and lung cancer, as well as mouse skin painting studies that confirmed the results of earlier research, threatened cigarette sales and tobacco stock prices. Trial Tr. at 686–88; *see generally* David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sanders, 2 *Modern Scientific Evidence: The Law and Science of Expert Testimony* §§ 27–1.0 to 28–2.4 (1997) (epidemiological studies and toxicological studies); D. Mical Freedman, Leon Gordis & Michael D. Green, *Reference Guide on Epidemiology*, in *Federal Judicial Ctr., Reference Manual on Scientific Evidence* 333 (2d ed.2000) (hereinafter *Reference Manual*); Bernard D. Goldstein and Mary Sue Henifin, *Reference Guide on Toxicology*, in *Reference Manual, supra*, at 181. Documents prepared by Hill & Knowlton, a representative of the tobacco industry, reveal:

> As another indication of how serious the problem is, the officials stated that salesmen in the industry are frantically alarmed and that the decline in tobacco stocks on the stock market has caused grave concern ...

PTX 6023; Trial Tr. at 1251–52.

> This is, of course, the most challenging problem our organization has ever faced—and perhaps the most challenging problem that ever faced a great industry, one with annual sales of almost 5 billions [sic] at retail, and with economic roots that reach clear back to the farm.

PTX 2148; Trial Tr. at 1253.

Due to the "grave nature" of this threat, the evidence demonstrated that the defendants developed a joint plan to rebut the mounting proof indicating that cigarettes were dangerous and to reassure the American public that the defendants would assume responsibility for researching whether smoking was dangerous to health:

> The underlying purpose of any activity at this stage should be reassurance of the public through wider communication of facts to the public. It is important that the public recognize the existence of weighty scientific views which hold there is no proof that smoking causes cancer.

PTX 2421; Trial Tr. 1256–57.

Defendants jointly formed the Tobacco Industry Research Committee (TIRC), later named the Council For Tobacco Research—USA (CTR) and issued "A Frank Statement to Cigarette Smokers." The "Frank Statement" was published on January 4, 1954 "in newspapers in virtually every city with a population of 50,000 or more, reaching more than 43 million Americans out of a population at the time of approximately 150 million." PTX 2426; Trial Tr. at 1260. Signed by the presidents of the defendant tobacco manufacturers, it denied that cigarette smoking was hazardous to health and promised that the tobacco industry would conduct independent research to address questions surrounding smoking and disease. It read in relevant part:

> — "Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors

of professional standing these experiments are not regarded as conclusive in the field of cancer research."

— "[T]here is no proof that cigarette smoking is one of the causes of lung cancer."

— "[Tobacco] always h[as] and always will cooperate closely with those whose task it is to safeguard the public health."

— "[Tobacco is] pledging aid and assistance to the research effort into all phases of tobacco [product] use and health."

— "For this purpose [Tobacco is] establishing a joint industry group .... This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE." (capital letters in original); and

— "In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry."

PTX 2362; Trial Tr. at 1257–60.

This statement of good faith was belied by internal documents from the defendants' own scientists suggesting that they possessed significant proof of the causal relationship between smoking and disease. *See, e.g.*, PTX 18 ("In view of the facts presented in this report, it is recommended that management take cognizance of the problem and its implications to our industry and that positive research action be planned without delay.") (1953); PTX 46 ("If we can eliminate and reduce the carcinogenic agent in smoke we will have made real progress.") (1954). The incongruity between defendants' public statements and internal documents lasted from the 1950s into the late 1990s.

 a. Public statements from the 1950s to the present

Plaintiff's evidence demonstrated that in public speeches, press releases, stockholder reports, television interviews, scientific studies, and letters to consumers and potential consumers, the defendants consistently denied the causal relationship between smoking and disease and argued to the public that more research was needed before a finding of danger was justified. In May 1957, George Weissman, vice president of Philip Morris, stated:

> Being as close to the picture as we are, we know that most of the attack is a lot of sound and fury. Without rehashing the arguments I'll merely assert that there's not one shred of conclusive evidence to support the link between cigarette smoking and lung cancer, certainly a lot less than the evidence concerning the inhalation of exhaust fumes from the automobiles driven around New York City and the smog fumes in Los Angeles.

PTX 9254; Trial Tr. at 4693.

The Tobacco Information Committee, an arm of the TIRC issued bi-monthly newsletters and press-releases to doctors, public health officials and members of the public. Early resulting headlines in the 1950s and 1960s included statements that cast doubt on ties between smoking and cancer. *See, e.g.*, PTX 5461 ("Six experts state doubts on smoking-cancer theory...") (1957); PTX 5462 ("Study suggests that bronchitis may be the prime factor in lung cancer..."); (January–February 1958); PTX 5470 ("Many Scientific Reports Show Uncertainties, Doubts About Causation of Lung Cancer...") (November–December 1959); PTX 5474 ("Smoker's Personality Key To Cancer...") (October 1960); PTX 5484 ("Lung Cancer Rare in Bald Men...") (March–April 1964); PTX 5489 ("Genetic Factors Affect Heart, Lung Syndromes. Smoking Is Probably Not Associated With Coronary Disease...") (Winter 1967–68).

Evidence demonstrated that these types of materials appeared all over the country in various forms. In a 1964 press release, George Allen on behalf of the defendants, stated:

If there is something in tobacco that is causally related to cancer or any other disease, the tobacco industry wants to find out, what it is and the sooner the better...

Research to date has not established whether smoking is or is not causally involved in such diseases as lung cancer and heart disease, despite efforts to make it seem otherwise. The matter remains an open question—for resolution by scientists.

PTX 0408.

In 1969, the American Tobacco Company mailed to more than 140,000 of its share holders a booklet entitled The Cigarette Controversy. The accompanying press release concluded:

Despite the volume and virulence of any tobacco propaganda, the cold fact remains that no clinical or biological evidence has been produced which demonstrates how cigarettes relate to cancer or any other disease in human beings.

PTX 1998.

In 1969, representatives of the defendants published "The Cigarette Controversy Eight Questions and Answers," which stated in part:

For many adults, cigarette smoking is one of life's pleasures. Does it cause a difference—even death. No one knows. The case against smoking is based almost entirely on inferences drawn from statistics and no causal relationship has actually been established. Many respected scientists find that cigarette smoking has not been shown to cause any human disease.

From these developments have come many public warnings:

"Don't smoke." "Stop smoking." A concerned public needs the truth about smoking and health. This requires that both sides of the controversy must be known. Statistics are not enough. If smoking does cause disease, why has it not been proved, after 15 years of intensive research, how this occurs?

. . . . .

Does smoking cause disease? That question is still an open one.

PTX 565; Trial Tr. at 2860–61.

That same year, representatives of Brown & Williamson stated in the advertising copy for "Project Truth:"

Ten years ago, there was a cancer scare over the wax in milk cartons. And over using iodine to get a suntan. These theories are about as valid as the one that says toads cause warts.

And they're about as valid as today's scare tactics surrounding cigarettes. Because no one has been able to produce conclusive proof that cigarette smoking causes cancer. Scientific, biological, clinical or any other kind.

PTX 0636; Trial Tr. at 2859–60.

According to an internal document produced from the files of defendant Liggett Group that discusses the defendants' response to the 1964 Surgeon General report, the approach of the tobacco industry was to speak on these issues in a united voice:

It is considered to be of prime importance that the industry maintain a united front and that if one or more companies were to conduct themselves as a matter of self interest, particularly in

advertising, obvious vulnerability would be the result.

PTX 0329; Trial Tr. at 3426–27.

Evidence demonstrated these kinds of public pronouncements continued into the 1970s, 1980s, and 1990s. In anticipation of the 1979 Surgeon General Report on Smoking and Health, which defendants knew would be adverse to them, representatives of the defendants released, "Smoking and Health: The Continuing Controversy." The 168 page text included the following statements:

> Indeed, many scientists are becoming concerned that the preoccupation with smoking may be both unfounded and dangerous. Unfounded because evidence on many critical points is conflicting. Dangerous because it diverts attention from other suspected hazards...
>
> Despite claims to the contrary, no one in government or industry can explain the reported associations of smoking with lung cancer, heart disease, emphysema, low infant birth weight, and yes, even cancer of the pancreas...
>
> Scientists have not proven that cigarette smoke or any of the thousands of constituents as found in cigarette smoke cause human disease...

PTX 6266. Examples of such post 1980 denials also included statements widely disseminated through television, conferences, and letter campaigns. Among them are the following:

— On October 20, 1983, Tobacco Institute spokesperson, Anne Browder, referring to smoking causation, told a national audience on the ABC program "20/20": "The case is still open. The jury has not come in." PTX 1444.

— The next year, the Tobacco Institute published a pamphlet, entitled, "The Cigarette Controversy: Why More Research Is Needed," which stated: "There is a cigarette controversy. The

*causal theory*—that cigarette smoking causes or is the cause of the various diseases with which it is reported to be related statistically—is just that, a theory." PTX 1444.

— On May 16, 1988, the Tobacco Institute published a press release titled, "Claims That Cigarettes Are Addictive Contradict Common Sense," which stated: "Smoking is a truly personal choice which can be stopped if and when a person decides to do so." PTX 1645.

— In a January 11, 1989 interview on the ABC program, "Good Morning America," Tobacco Institute representative Brennan Dawson stated the following on behalf of the tobacco industry: "[T]he causative relationship has not been established ... I can't allow the claim that smoking is addictive to go unchallenged.... It's a matter of willpower." PTX 9508.

— Walker Merryman, Vice President of Tobacco Institute, wrote the following in an article published on April 27, 1989, in the Washington Times: "The difference between cigarette smoking and true addictions to hard drugs is stark and compelling." PTX 9791.

— In 1992, Philip Morris published a pamphlet entitled, "Tobacco Issues and Answers," that stated: "Those who term smoking an addiction do so for ideological, not scientific reasons." PTX 5786.

— On April 15, 1994, the day after its and other CEOs from the industry testified before Congress that smoking was not addictive, Philip Morris placed an advertisement in the New York Times that stated: "Fact: Philip Morris does not believe smoking is addictive." PTX 1814.

Letters were sent to consumers all across the country, including many New York residents. Articles like the "Con-

tinuing Controversy" written in the 1970s denying causal connection between smoking and cancer were re-circulated in mailings after 1980. Letters included the following statements:

— "Despite all the research going on, medical science has not found any conclusive evidence that any element in cigarettes, tobacco, or tobacco smoke causes human disease."

— "We firmly believe that cigarettes have been unfairly blamed as a cause of human disease."

— "With the numerous attacks being made on smoking, it is indeed refreshing to read a letter such as yours and to be reassured that not everyone has accepted without question the adverse publicity the tobacco industry has received... Throughout the years, the public has received a largely one-sided view of the questions that have arisen about tobacco ... Through a series of messages appearing in national newspapers and magazines, we are attempting to provide our side of such public issues as ... passive smoking, smoking courtesy and smoking and health."

— "[I]n the absence of the identification of the processes or mechanisms involved in cancer causation, together with experimental animal evidence which raises questions regarding causation, we believe that scientific proof that cigarette smoking causes chronic diseases in humans is still lacking."

PTX 9853 (containing over 150 letters).

Communications reached elementary school teachers and principals. A 1990 form letter responding to inquiries from fifth grade students at a New York elementary school reads in relevant part:

"[T]he simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The an-

swers to many unanswered smoking and health questions—and the fundamental causes of the diseases often statistically associated with smoking—we believe can only be determined through much more scientific research."

PTX 1688.

Other evidence confirmed that these communications were part of a general policy for the 1980s and beyond. *See, e.g.,* PTX 1042 (Summarizing plans in conference titled "Marketing in the 80's": "Overall marketing policy will be such that we maintain faith and confidence in the smoking habit, whether brand choice is traditional or not in particular markets. This means that B.A.T. will not remain on the defensive, by simply reacting to alleged 'health' hazards and related competitive challenges: instead we shall actively seek out all worthwhile prospects for brand and product reassurance in marketing throughout the world.").

b. Knowledge from the 1950s to the present

Although the representatives of the defendants continued to release public statements and reports suggesting that smoking neither caused adverse health effects nor was addictive—as well as to finance research to support these claims—evidence demonstrated that defendants knew the contrary to be true: that smoking is both lethal and addictive.

Internal documents from defendants indicate that through independent company research and the sharing of this research through the TIRC and CTR, each of the major tobacco product manufacturers was aware early on that tobacco contributed to lung cancer. For example, a 1956 confidential memorandum from a Philip Morris Vice President of Research and Development to top executives at the company

regarding the advantages of "ventilated cigarettes" stated: "Decreased carbon monoxide and nicotine are related to decreased harm to the circulatory system as a result of smoking . . . . [D]ecreased irritation is desirable . . . as a partial elimination of a potential cancer hazard." PTX 105; Trial Tr. at 5391–92.

Similarly, a British American Tobacco Company (BATCo) document produced in 1958 following a series of meetings between BATCo representatives and twenty American scientists and researchers—including at least nine representatives of the tobacco companies and the Scientific Advisory Board of TIRC—stated that all of the tobacco company researchers with whom they met in the United States (and all but one of the outside people) "believed that smoking causes lung cancer" and noted that there was "general acceptance [among the group] that the most likely means of causation is that tobacco smoke contains carcinogenic substances present in sufficient quantity to promote lung cancer when acting for a long time in a sensitive individual." PTX 0128.

That same year, a Philip Morris Vice President of Research, who later joined its Board of Directors, stated in a confidential internal memorandum that "the evidence . . . is building up that heavy cigarette smoking contributes to lung cancer either alone or in association with physical and physiological factors." A 1963 confidential internal memorandum from Liggett's research consulting firm admitted: "Basically we accept the inference of a causal relationship between the chemical properties of ingested tobacco smoke and the development of carcinoma . . . "

In addition to knowing early on that smoking is linked to lung cancer, evidence demonstrated that Tobacco was aware of other major deleterious health effects caused by smoking, including bronchitis,

emphysema, and cardiovascular disease. To support this contention, plaintiff introduced among other documents the following excerpts from internal company materials:

— A 1963 confidential memorandum to Philip Morris's President and CEO describes components of cigarette smoke as "known carcinogens" and states: "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field."

— An internal memo produced for a B.A.T. Group Conference (e.g., BATCo, Brown & Williamson, and other subsidiaries of B.A.T. Industries) in November 1970 that states "nicotine may be implicated in the aetiology of cardiovascular disease."

Evidence also demonstrated that Defendants understood at least for the past four decades that smokers continue to smoke not by choice, but because of nicotine addiction. The evidence included confidential BATCo documents related to BATCo's "Project Hippo" that indicate that at least as early as 1962 defendants were aware of the physiological and pharmacological effects of nicotine. PTX 0230. Copies of Project Hippo reports were circulated to TIRC, BATCo, Brown & Williamson, and R.J. Reynolds.

A 1963 memorandum written by Addison Yeaman, General Counsel at Brown & Williamson, concludes: Tobacco is "in the business of selling nicotine, an addictive drug." PTX 1978. Similarly, a 1978 internal Brown & Williamson memorandum acknowledges that "very few consumers are

aware of the effects of nicotine, i.e., its addictive nature and that nicotine is a poison." PTX 1128. Overwhelming evidence that Tobacco was aware of nicotine's addictive properties is incorporated in a 1972 report by Philip Morris presented at a CTR conference; it states:

— "[N]icotine is the active constituent of cigarette smoke";

— "Without nicotine ... there would be no smoking.";

— "Why then is there not a market for nicotine per se, to be eaten, sucked, drunk, injected, inserted or inhaled as a pure aerosol? The answer, and I feel quite strongly about this, is that the cigarette is in fact among the most awe-inspiring examples of the ingenuity of man.";

— "The cigarette should be conceived not as a product but as a package. The product is nicotine ...";

— "Think of the cigarette pack as a storage container for a day's supply of nicotine ....";

— "Think of the cigarette as a dispenser for a dose unit of nicotine."

PTX 2355.

Further internal memoranda demonstrate that the defendants knew that nicotine addiction could lead smokers of low-tar cigarettes to compensate, that is take longer and deeper puffs of cigarettes or to smoke more until the health benefits of these marketed products became negligible. A 1976 Lorillard memorandum stated:

The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the addictive properties of smoke is nicotine. Indications are that the smoker adjusts his smoking habits to satisfy the desire for nicotine, either by frequent or large puffs on the cigarette, or smoking a large number of cigarettes.

Trial Tr. at 444; *see also* PTX 0772 ("Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, so as to obtain and maintain his per hour, per day requirement for nicotine ..."); *see also* Part IV B 3 *infra*.

2. Defendants funded scientific studies to discredit scholarship demonstrating causation

Evidence at trial also suggested that defendants never intended to fund and produce the objective research it advertised. Internal documents such as the following acknowledged that research grants and studies sponsored by TIRC and CTR were intended to reassure the public, driven by litigation, and designed to sow doubt about the hazards associated with smoking:

— "Historically, the joint industry funded smoking and health research programs have not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc. ... In general, these programs have provided some buffer to public and political attack of the industry, as well as background for litigious [sic] strategy." PTX 0807; Trial Tr. at 3156.

— "For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts—litigation, politics, and public opinion. While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not—nor was it intended to be—a vehicle for victory. On the contrary, it has always been a holding strategy, consisting of creating doubt about the health charge without

actually denying it. Advocating the public's right to smoke without actually urging them to take up the practice. Encouraging objective scientific as the only way to resolve the question of health hazard." PTX 0779; Trial Tr. at 3168–69.

— "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes disease... [A]ll caveats and platitudes aside, we must assume that CTR exists for the good of the [tobacco] industry." PTX 0724; Trial Tr. at 3146.

As part of this effort, plaintiff's evidence showed defendants deliberately refrained from conducting in-house biological research demonstrating the causal relationship between smoking and cancer.

Evidence demonstrated that the defendants agreed to refrain from conducting biological testing of its products as marketed on animals in order to suppress research that was expected to lead to scientific confirmation that cigarettes being smoked by the public were hazardous. It included internal memoranda which referred to a "gentlemen's agreement" not to conduct animal laboratory experiments. An internal document, written by Associate Director of Scientific Issues for R.J. Reynolds, Frank G. Colby, dated December 9, 1981, states:

> Information was obtained that Philip Morris U.S.A. does not live up to the alleged 'gentlemens agreement' of not having animal laboratory facilities on their premises in this country.

PTX 1313; Trial Tr. at 2743; see also PTX 2230, Trial Tr. at 2746 (undated Philip Morris document) (accord).

3. Defendants suppressed the development of new safer products to intercept quitters and to dispel appearance that their products were unsafe

In addition to covering up the health risks and addictiveness of smoking, evidence demonstrated the defendants misled the public into believing that smoke from "lighter" cigarettes, containing reduced levels of tar and nicotine relative to that released by conventional cigarettes, would result in substantially less dangerous cigarettes. The defendants suppressed research into less harmful cigarettes as part of the cover-up of the continuing danger from low tar cigarettes.

Evidence demonstrated that defendants fraudulently promoted filtered and low-tar cigarettes as safer or healthier cigarettes than conventional ones. "Light" cigarettes, the evidence showed, lacked significant health benefits over conventional cigarettes, and in many instances increased the risk of emphysema, heart disease, and other diseases caused by smoking. Trial Tr. at 1386–1391. This is because of an effect called compensation: smokers of light cigarettes tend to smoke more, inhale more deeply, and hold the smoke in their lungs longer, in order to maximize their absorption of nicotine. Id. The jury could find that any real health benefit was far less than defendants led the public to believe and that this conduct was particularly insidious and effective in misleading smokers.

One goal in designing new products was, plaintiff evidence showed, to "intercept" quitters. See PTX 9666. As a 1978 Brown and Williamson internal memorandum put it: "Perhaps answers to another question 'How do people stop smoking?' could lend insight into the creation of new

products. Having answers to this latter question, we might then design products to 'intercept' people who are trying to give up smoking." PTX 1042. A BATCo internal memorandum stated: "All work in this area should be directed towards providing consumer reassurance about cigarettes and the smoking habit. This can be provided in different ways, for example, by claimed low deliveries, by the perception of low deliveries and by the perception of mildness. Furthermore, advertising for low delivery or traditional brands should be constructed in ways so as not to provoke anxiety about health but to alleviate it and enable the smoker to feel assured about the habit and confident in maintaining it over time." Trial Tr. at 1844–45; *see also, e.g.,* Trial Tr. at 1845–50 (Pollay) (discussing defendants' health messages in advertising and other public communications, including those related to low tar cigarettes); PTX 6548.019, 6548.021, 6548.023 (examples of advertisements for low tar cigarettes with express or implied health messages). It was not seriously disputed that defendants failed to inform the public about their knowledge of the limited health benefits of low tar cigarettes and their knowledge of smoker compensation by a change in the smoker's habits.

The evidence demonstrated that a second reason to delay the development of "safer" cigarettes stemmed from a general fear by defendants that over-aggressive marketing of low-tar products would alert the public to the dangers of stronger cigarettes. For example, documents from B.A.T. Industries, the parent company of Brown and Williamson, revealed that in 1978 Chairman Sir Patrick Sheehy, warned its affiliates against attempting to develop truly safer products:

"... I thought I should write to explain why it is that I cannot support your contention that we should give a higher priority to projects aimed at developing a 'safe' cigarette (as perceived by those who claim our product is unsafe), by either eliminating, or at least reducing to acceptable levels, all components claimed by our critics to be carcinogenic..."

"[I]n attempting to develop a safe cigarette you are, by implication, in danger of being interpreted as accepting that the current product is 'unsafe' and this is not a position that I think we should take."

PTX 9750.

Plaintiff's documents illustrated that this practice of delaying attempts to improve cigarette safety could be traced back to the 1950s. For example, a 1953 Hill and Knowlton memorandum to defendants' representatives entitled "Some Things To Do" states:

"Develop some understanding with companies that, on this problem, none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a brand any less likely *to cause you-know-what*. No "Play–Safe–with–Luckies" idea—or with Camels or with anything else."

PTX 2148 (emphasis added).

The tactic of broad denials of knowledge of harm by the industry was reflected in its research strategy. Evidence revealed that despite the continuing growth of each defendants' in-house research efforts, the defendants as a whole continued throughout the 1980s and 1990s to adhere to a "gentlemen's agreement" to avoid actual marketing any significant risk reducing innovation that would redound to one defendant's private benefit. PTX 6654; Trial Tr. at 2255–57. Potentially innovative risk reducing products were actually developed,

but never seriously marketed. Others were introduced but without much attention to the fact that they might reduce health risks. *See* Trial Tr. 3401–02.

Testimony of plaintiff's members confirmed that through defendants' misstatements and omissions, defendants were successful in causing people to purchase and smoke low tar cigarettes (rather than quitting) in reliance upon the supposed health benefit communicated by defendants. *See* PTX 9903 (excerpts of Empire member testimony on light, low tar and filter cigarettes). The jury could conclude that this strategy had a misleading "informational effect" on emerging markets of tobacco consumers. It misled more "health conscious" consumers to continue to smoke a product just about as dangerous as regular tar brands, while limiting the total information available to the public about the relative risks of smoking.

### 4. Defendants covered-up

Evidence also showed the tobacco industry purposefully concealed research in the United States. As one industry document stated, "[t]he burden of proof has shifted. It is no longer up to the scientists to prove that cigarettes cause lung cancer. It is the duty of all concerned to prove that they do not." PTX 2158 (internal quotations omitted). Other documents reveal members of the industry diverted correspondence through lawyers that contained "contentious information"—i.e., adverse health information sought to be covered up. PTX 1514, Trial Tr. at 2250–51 (There is a "mechanism for [ ] sending scientific information to B & W. In principle it will mean [ ] mailing contentious information to a legal man called Maddox ... with a covering letter ... saying that Millbank has asked that [Maddox] receive it.").

Documents charged subordinates to "root out" adverse information that would

generate negative implications and to produce information that would encourage consumers to continue to smoke. PTX 10, Trial Tr. at 3130–31 ("The research of CTR ... discharged a legal responsibility. The manufacturer has a duty to know its product."); *see also* PTX 1451, Trial Tr. at 2246–48 ("RD & E is interested in information pertaining to the role of nicotine in the smoker's subjective perception of smoke quality. If the reports stick to research data, the reports would be interesting. However, if the reports include discussions of pharmacological effects of nicotine, the information will not be interesting and would be helpful to the plaintiff. RD & E will begin receiving reports from this activity and be prepared to inform BAT to cease sending the data to B & W if the science is not interesting.").

Some reports were to be withheld from the United States Surgeon General as well as from TIRC members if one of the defendants was disturbed at the report's "implications [regarding] cardiovascular disorders." PTX 294 ("TIRC agreed to withhold disclosure [of] Battlelle Reports to TIRC members or SAB until further notice ... [and submission of] Battelle or Griffith Developments to [the] Surgeon General [is] undesirable and ... continuance of Battelle work [is] useful but [the company is] disturbed at its implications [regarding] cardiovascular disorders."). Information pertaining to the "carcinogenicity" of tobacco smoke was also vetted from reports. PTX 2470 ("The review of [ ] heterocyclic nitrogen compounds identified in tobacco smoke ... was omitted from our manuscript because of the reported carcinogenicity of the ... compounds.").

### C. Evidence that Deceptive Practices Caused Consumers and Plaintiff Damages

Plaintiff's evidence demonstrated that defendants knew such deceptive practices

would cause—and that their practices did cause—plaintiff's damages.

1. Defendants knew the public would act upon deceptive practices

Evidence showed the tobacco industry knew the consequences of prolonging the debate over the adverse effects of smoking would be to reassure addicted consumers to continue using their products:

"[The goal is to] reassure the public, and still instinctive fears ... when definitive facts for giving complete assurance are still lacking; when scientific doubts must remain; and when new 'unfavorable' information can emerge from some laboratory at any time, to act as a bomb shell on the whole tobacco industry."

PTX 2148.

Other documents substantiate this view of defendants' program to mislead and string along smokers. PTX 0694; Trial Tr. at 3149–50 ("The CTR (then TIRC), was formed in the early 1950's in response to published reports linking cigarette smoking with various diseases. The primary purpose for the initial formation was a public relations one. . . . The CTR, with the help of others, has kept certain questions open when a large body of anti-tobacco scientists claimed the easy answers had been found."); PTX 0503; Trial Tr. at 3141–42 ("the long established policy of CTR, carried out through [the Scientific Advisory Board is to] ... maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco; and ... the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."); PTX 9750 ("The BAT objective is and should be to make the whole subject of smoking acceptable to the authorities and to the public at large since this is the real challenge facing the Industry. Not only ... is [this] the right objective but ... it is an achievable one."); PTX 136; Trial Tr. at 1277–78 (A public relations campaign was suggested to "describe more or less truthfully the dramatic efforts" of Philip Morris to safeguard the public. The company also sought to make a pledge so that the public could be "assured that Parliament (Marlboro) would immediately bring them any tar and nicotine reducing innovations that were consistent with good smoking and that [Philip Morris] would do this no matter how much effort and expense were required. . . . [T]he attempt would be made to build an image of the brand as a brand that was made and sold by people who were genuinely concerned about the health of their customers and did not believe in taking chances with the health of their customers.").

2. Evidence that defendants' misrepresentations caused consumers and plaintiff damages

Evidence in the form of expert testimony* and analysis, and the depositions of plaintiff's members, establishes that plaintiff met its burden of proving that defendants' deceptive practices caused it injury. A key question was would plaintiff's members' smoking behavior have been different if defendants had been truthful rather than deceitful. The testimony of plaintiff's experts, documents and the deposition testimony of plaintiff's members, provided strong evidence in support of an affirmative answer.

Plaintiff's experts testified that: (1) members of the American public, including plaintiff's members, underestimated the health risks of smoking at the time they started smoking and afterward; and (2) public acknowledgment by the tobacco

companies that they believed smoking causes lung cancer and other diseases would have led the American public, including plaintiff's members, not to start smoking, or to smoke less, or to quit smoking earlier. Trial Tr. at 3748.

### a. Expert testimony

Defendants' objections to plaintiff's experts' testimony was ruled on repeatedly at trial. Critical aspects need only be summarized here. The legal basis for utilizing the statistical analysis of plaintiff's and defendants' experts is set out in Part VII, *infra*.

### i. Dr. Jon Krosnick

The testimony of Dr. Jon Krosnick, a behavioral scientist and leading expert on survey methodology, demonstrated how defendants' misrepresentations affected subscribers of the plaintiff. Dr. Krosnick presented detailed empirical data that the plaintiff's subscribers significantly underestimated the health risks and addictiveness of smoking, that the misrepresentations of the tobacco companies had a substantial impact on subscribers' perceptions of these risks, and that if the defendants had not engaged in the deceptive conduct proved by plaintiff fewer would have started to smoke and more would have quit sooner. Trial Tr. at 3731–3732. Dr. Krosnick was fully qualified by training, experience, and his published studies supporting his views. He employed standard survey procedures and analysis.

Dr. Krosnick's conclusions were based on statistical analysis of three types of data. First, Dr. Krosnick supervised a two thousand person telephonic survey conducted by an independent national survey research firm, Schulman, Ronca, Bucuvalis, Inc., to assess the impact of smoking related information on consumers. This survey was conducted according to acceptable survey techniques. Second, he compared these results with a comprehensive literature review of pre-existing surveys and articles assessing people's perceptions and attitudes concerning the health risks of smoking. *Id.* at 3733.

Third, Dr. Krosnick relied on a randomized sample of 156 Empire subscriber depositions, and over three hundred depositions of other Blue Cross plans, to extrapolate statistically meaningful inferences about the plaintiff subscriber population as a whole. Depositions were to be taken in person for three hours, with standardized questions, and without witness preparation to preserve the purity of the sample. Subscribers were either current or former smokers of plaintiff or other Blue Cross plans, all of whom had submitted health care costs to these plans. The sampling procedure conformed to standard practice.

Dr. Krosnick had each of the relevant depositions reviewed by neutral coders who were appropriately selected, instructed and supervised. They coded the transcripts according to set instructions and coding questions. *Id.* at 3775–76. These questions, which were divided into five groups, focused on (1) what deponents now believed about the health risks and addictiveness of smoking regularly; (2) what deponents believed about the health risks and addictiveness of smoking at any other time after they had become regular smokers; (3) the deponents' beliefs about their exposure to statements made by the tobacco companies about the health risks of smoking; (4) the deponents' beliefs about their exposure to statements made by the tobacco companies concerning the addictiveness of smoking; and (5) the deponents' beliefs about how certain tobacco company statements would have affected their smoking behavior if they had been

made to the public prior to, or during, the time that the witness smoked regularly. Trial Tr. at 3792–98.

The coding analysis of the depositions and the jury's view on a large screen of the witnesses being deposed, as well as their own analysis of transcripts of all relevant depositions, could lead the jury to find that: (1) a percentage of plaintiff's members believed that, at the time they started smoking regularly, smoking was not risky to their health or addictive; and (2) many plaintiff's members would have changed their smoking behavior if the tobacco companies had made timely candid statements about what defendants knew were the health risks and addictiveness of smoking. *Id.* at 3810–21.

The results obtained from analyzing the plaintiff's members' depositions were confirmed by the results of the depositions taken of members of plans other than plaintiff. *Id.* at 3774. Dr. Krosnick also relied upon other surveys that had been conducted by reputable survey and polling organizations. *Id.* at 3733. Employing different methodological approaches to reach like results alleviated the potential limitations of any one approach. *See* David H. Kaye and David A. Freedman, *Reference Guide on Statistics, Reference Manual, supra* at 97 ("Sometimes several experiments or other studies, each having different limitations, all point in the same direction... Such convergent results strongly suggest the validity of the generalization."); Hans Zeisel & David Kaye, *Prove It With Figures: Empirical Methods in Law and Litigation* 68–78 (1997) ("Still more powerful support comes from when studies based on distinct research approaches (or employing the same general research approach but having differing strengths and weaknesses) reach comparable results"); Shari S. Diamond, *Exploring Sources of Sentencing Disparity, The Tri-*

*al Process* 387 (1981) (comparing simulated methods and actual case analysis to determine disparities among federal sentences); Harry Kalvin & Hans Zeisel, *The American Jury* 453–73 (1966) (separate approaches to assess impact of unanimity requirement on hung juries).

Dr. Krosnick concluded that smokers underestimate the relative risks of smoking, and that but for the misleading misrepresentations of the tobacco industry in the 1980s and afterward, more smokers would have changed their smoking behavior. He provided quantitative bases for his opinion.

### ii. Dr. Jeffery Harris and others

Dr. Jeffery Harris, a medical doctor and an economist, provided statistical evidence about the effect of the defendants' misleading statements on smoking behavior. Tracing populations of smoking prevalence in consumers around the country exposed to different levels of information, Dr. Harris modeled the impact of the defendants' misrepresentations on the plaintiff's subscribers. He traced the effects of two types of misconduct: 1) the health consequences which resulted from defendants' misrepresentations (an "information effect"); and 2) the consequences of defendants' "gentlemen's agreement" not to compete to produce less hazardous products or to delay their introduction (an "innovation effect").

Dr. Harris's opinion and analyses and the bases for his conclusions were sufficient to prove that smokers relied on publically available information in deciding whether to start and stop smoking and that the smoking behavior of plaintiff's members would have been different had it not been for defendants' fraud. His study showed how information "moves smoking rates," demonstrating that as consumers were exposed to different information

about smoking, their smoking behavior changed. Trial Tr. at 3558. Empirical evidence further demonstrated that, according to this witness, consumption of cigarettes has historically decreased after significant disclosure about the dangers of smoking. *Id.* He testified that based upon data from many peer reviewed studies, accurate and timely information increased smokers "quit rates" and reduced teenage "initiation rates."

Using economic and statistical tools, Dr. Harris created a counterfactual model to graph what smoking patterns would look like had the defendant not misrepresented the hazards of its product to the public. He then calculated a "conduct attributable fraction" for each year—one based on the "informational effect" and the other on the "innovation effect" representing the portion of medical costs due to smoking related illnesses resulting from defendants' fraud. Under this information effect, Dr. Harris found that the rate of subscribers quitting smoking would have increased by 4.5% per year (as opposed to a rate approximating 3% per year) in the absence of a conspiracy to deceive the public. Trial Tr. at 3448–3450. He reported that his 4.5% figure was conservative, and that had he mechanically relied upon the results of the underlying studies, quit rates could have increased to as high as 10%. Harris Dec. at 6 (Sept.2000).

Dr. Harris used a separate model to determine the effects that resulted from defendants' attempt to suppress the introduction of safer cigarettes into the market. To measure this "innovation" effect, Dr. Harris consulted surveys, studies, and epidemiologic data to determine the rate at which the health risks of smoking had actually declined since the 1950s. He then measured how much faster the risks of smoking would have declined with the use of a truly safer technologically available cigarette. His measurements were also based on case-studies of risk reducing technologies that were never marketed, as well as defendants' rate of spending on research and development compared with those in other benchmark industries.

Dr. Harris's reliance on a combination of research techniques—mathematical models, statistical regression analysis methods, analysis of data from relevant benchmark industries, and reasoned judgments based upon available data—were consistent with data and research methods of other professional economists.

The smoking attributable costs calculated by Dr. Max and Dr. Harrison were utilized in combination with Dr. Harris's calculations to determine total damages on a per annum basis. Several thorough and prolonged hearings (in this case and in related actions) established that these statistical models satisfied *Daubert* and could be used in combination with individualized evidence to satisfy each element of the plaintiff's action.

b. Videotaped depositions

Videotaped depositions of smoker subscribers also substantiated the effect defendants' misstatements had on consumers. Relevant portions of 71 depositions relied upon in Dr. Krosnick's study were played to the jury. Some of these depositions showed that plaintiff's members underestimated the health risks of smoking at the time they started smoking (and afterward) and that public acknowledgment by the tobacco companies that they believed smoking causes lung cancer and other diseases would have led them not to start smoking, to smoke less, or to quit smoking earlier.

Many testified that the misrepresentations created doubt in the consumers' minds about the effects of tobacco use and reassured addicted users that it was safe

to continue smoking. *See, e.g.,* Sub. Dep. 156 NY 10 ("A: But at the time that these warnings came out is the same time the advertisement came out saying there was no proof. . . . So we're trying to weigh it on our own."); Sub. Dep. 156 NY 35 ("Q: Understanding that, what was it about the statement from the tobacco industry that you believe influenced you away from quitting? A: Probably that tests weren't conclusive."); Sub. Dep. 156 NY 61:52 ("Q: *And having seen this warning, the warning* didn't make you stop smoking, did it? A: No, I was very healthy. You know, we all thought, everyone really, I can't speak for the whole world, but . . . my circle of friends all thought that . . . they [the public health community] don't know what they're talking about. They're just doing this to get on a bandwagon of some sort."); Sub Dep. 156 NY 66:107–8 ("A: . . . I remember watching on television. It was [an] R.J. Reynolds . . . CEO type . . . saying that he smoked, you know, and that he sees nothing wrong with it and it doesn't impact his health at all. . . . Q: Did you take the same comfort? A: Yes, I did.").

Other testimony indicated that subscribers were affected by defendants' failure to fund and produce the objective research it advertised it would:

Q: Did you know that as of February 2nd, 1953, that R.J. Reynolds had indicated in its documents . . . that studies of clinical data tend to confirm the relationship between heavy and prolong tobacco smoking and the incidence of cancer of the lung?

A: Absolutely not.

. . .

Q: And if R.J. Reynolds had disclosed to you and to the public that studies of clinical data tend to confirm the relationship between heavy and prolonged tobacco smoking and the incidence of can-

cer of the lungs, do you think that would have affected you?

A: Very much so.

Q: How so.

A: It would have scared me to death.

Sub. Dep. 156 NY—61:126; *see also, e.g.,* Sub. Dep. 156 NY—38:152–53 ("A: . . . They were making available to us teens other information. I don't understand if it was available why we wouldn't have seen stuff like this on TV. If they were showing one part, and this indeed was available to the public, why weren't we seeing this part of it? . . . I can honestly say if I had this in front of me, I think I would have chosen not to smoke."); Sub. Dep. 156 NY—35: 174 ("If they would have came forward to say that the product had some bad effects, long term effects, I would have probably looked upon it as that . . . in . . . [the] long term that it would be bad for me.")

Many testified that they were reassured by the non-verbal messages associated with smoking, while others verified the supposed effect of low tar products on intercepting quitters. *See, e.g.,* Sub. Dep. 156 NY 51:132 ("Q: Do you recall any statements or ad by the tobacco companies that provided some reassurance to you that smoking might not be bad for you . . . A: Well, like I said earlier before when *the guy—I believe the guy is carrying the girl and they look like they're happy, it's like the guy can smoke and he still has his—he is giving the girl a piggyback ride* and I guess he smokes, like hey you know, if smoking was bad for you you wouldn't be able to do this. You know."); Sub Dep. 156 NY 35:58–9 ("Q: Any statement from the tobacco industry that you believe influenced you not to quit? A: I would say when they started to come out with the light cigarettes, low tar cigarettes.").

This subscriber testimony was not universal, but it was nonetheless highly probative, and subject to skilled cross

examination. The jury could find that significant portions of the deposition testimony corroborated statistical studies, extrapolations, and the conclusions of plaintiff's experts.

### c. Surveys, medical and psychological literature, and documents

Ample surveys and literature were also provided to the jury. These included studies from the American Cancer Society, studies published in established psychological and medical journals, and Surgeon General reports. These documents supported plaintiff's contention about the kind of impact defendants' misrepresentations had on the population as a whole. *See, e.g., Reducing the Health Consequences of Smoking: A Report of the Surgeon General* 345 (1989) ("Another possible reason for some smokers' insensitivity to smoking risks is that they have not always been given the full message, or they have been given mixed messages from the cigarette industry. Factors that impede public awareness and acceptance of the health hazards of smoking include cigarette advertising and promotion and cigarette companies' public relations and lobbying activities.").

## V. Remoteness Under New York's Consumer Protection Act

■ Defendants' claim is that the plaintiff is too remote to recover damages under section 349. The language, history, and purpose of New York's consumer protection act—titled New York General Business Law section 349—establish that a health provider such as Blue Cross damaged by a fraud visited upon its insured may enforce the statute in the same way as any other injured business. *See Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000) (statutory construction guided by language, legislative history and purpose of statute) (citations omitted). The force of this state statute, and the history and application of similarly devised consumer statutes, support this conclusion.

### A. Language

Section 349, reads in relevant part:

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

. . . . .

(g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

The text of the statute is expansive. Like other statutes of its kind, *see* Part V C, *infra,* it does not expressly circumscribe who "any person" is, what constitutes a "deceptive practice," or what kinds of injuries are compensable. The legislative design and history, read in tandem with the

broad language of section 349 support suits for the injuries here alleged.

B. Legislative Design and History of New York General Business Law Section 349

■■■ New York's General Business Law section 349 was designed as a broad, remedial statute to relax traditional barriers to common law fraud. *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999) ("In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer protection concerns"). The legislature created the private action to augment the New York Attorney General's powers in enforcing consumer protection laws and to ensure trust and transparency in the marketplace. *Id.* at 343–44, 704 N.Y.S.2d 177, 725 N.E.2d 598 ("Owing to the ever-changing types of false and deceptive business practices which plague consumers in our State, the Governor signed the measure into law. In 1980, the Legislature took a significant step to expand the statute's enforcement scheme by allowing a private cause of action.") (citations omitted). It was also intended "to even the playing field" in disputes with better funded and "superiorly situated fraudulent businesses." *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 630 N.Y.S.2d 769, 774 (N.Y.App.Div.1995). As under some of the state statutes in the country, businesses indirectly injured by deceptive conduct as well as consumers are afforded this statutory private right in New York.

■■■ As a remedial statute, section 349 is "liberally construed to carry out the reforms intended and to promote justice." *Hart v. Moore*, 155 Misc.2d 203, 587 N.Y.S.2d 477, 479 (N.Y.Sup.Ct.1992). In recent years, the New York Court of Appeals has read the act to eliminate tradi-

tional requirements of reliance and scienter and to permit attorney's fees, costs and punitive damages (up to a statutory maximum). *See, e.g., Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) ("A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act."); Lisa J. Rodriguez, *Intersection Between UDAP Statutes and Class Actions*, Practicing Law Institute, 1242 PLI/Corp 377 (2001) (comparing variety of consumer protection statutes and characterizing New York's as one of the broadest). A broad interpretation of section 349 is consistent with the design of the drafting committee which attempted to ensure that the Act would be capable of expanding to counter evolving forms of deceptive conduct. *See Karlin v. IVF Am., Inc. et. al.*, 93 N.Y.2d 282, 290–91, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999); Dole, *Merchant and Consumer Protection: The New York Approach to the Regulation of Deceptive Trade Practices*, 53 Cornell L.Rev. 749, 749 (1968); Report of the Committee on New York State Antitrust Law of the Antitrust Law Section of the New York State Bar Association: A Proposed New State Law Making Deceptive Acts or Practices Unlawful, 1968 N.Y. St. B.A. Antitrust L. Symp. 114, 128, 129. The Act was designed as a substantive new remedy to apply "to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state." *See* New York General Business Law § 349(g) (McKinney 1994).

The private right of action was added to section 349 in 1980, after the "limited resources of the Attorney General made it virtually impossible to provide more than 'minimal enforcement' of General Business

Law 349." *Karlin*, 93 N.Y.2d at 290–91, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999); *see also Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 532, 647 N.E.2d 741 (1995). To ensure vigorous enforcement, the statute granted standing to businesses and consumers alike, so long as the claim affected consumer interests. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995) ("The critical question, then, is whether the matter affects the public interest of New York, not whether the suit is brought by a consumer or competitor."); *Constr. Tech., Inc. v. Lockformer Co., Inc.*, 704 F.Supp. 1212, 1222 (S.D.N.Y.1989); *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988); *Sulner v. General Accident Fire & Life Assur. Corp.*, 122 Misc.2d 597, 599–600, 471 N.Y.S.2d 794, 796 (N.Y.Sup.1984) ("In supporting passage of the legislation, the Attorney General took the time to underscore its application"; "a business itself will be able to use the private right of action against another business engaged in deceptive practices and thereby obtain increased legal protection.") (citing Memorandum of Attorney General (contained in Bill Jacket for ch. 346 of 1980 N.Y. Laws)).

■ The New York Act parallels the most aggressive statutes enacted in the country. *See* Robert E. Reyna, *State Little FTC Acts and Unfair Methods of Competition*, SB75 ALI–ABA 47 (1997) (describing New York, Texas, and California as most active in enforcing consumer protection laws); Joseph Thomas Moldovan, *New York Creates a Private Right of Action*, 48 Brook. L.Rev. 509, 559 (1982) (consumer protection exceeds the boundaries of deceptive conduct proscribed in uniform acts); *cf. Gaidon*, 94 N.Y.2d at 347 n. 11, 704 N.Y.S.2d 177, 725 N.E.2d 598 (characterizing New York statute as "similar" to other strong statutes in Minnesota and Illinois). The New York Court of Appeals has recently reemphasized that section 349 applies to virtually "all economic activity." *See Karlin*, 93 N.Y.2d at 290–91, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999) ("These statutes on their face apply to virtually all economic activity and their application has been correspondingly broad"). New York state courts' application of section 349 has been correspondingly broad. *See, e.g., People v. Appel*, 258 A.D.2d 957, 685 N.Y.S.2d 504 (N.Y.App.Div.1999) (statute applies to editing business); *Griffin–Amiel v. Terris Orchestras*, 178 Misc.2d 71, 677 N.Y.S.2d 908 (1998) (wedding singer); *Baker v. Burlington Coat Factory Warehouse*, 175 Misc.2d 951, 673 N.Y.S.2d 281 (1998) (clothing retailer); *Perez v. Hempstead Motor Sales*, 173 Misc.2d 710, 662 N.Y.S.2d 184, *affd.* 176 Misc.2d 314, 674 N.Y.S.2d 564 (1998) (automobile dealer); *People v. Lipsitz*, 174 Misc.2d 571, 663 N.Y.S.2d 468 (N.Y.Sup. Ct.1997) (magazine subscription seller).

Businesses and consumers suffering indirect injuries may sue under the statute. *Vitolo v. Dow Corning Corp.*, 166 Misc.2d 717, 634 N.Y.S.2d 362, 366 (N.Y.Sup.Ct. 1995). Consumer statutes of several states at the time the New York statute was amended required that the injured person be the same person who purchased the goods or services. *See, e.g.*, Me.Rev. Stat. Ann. tit. 5, § 213(1) (1979 & Supp. 1981–1982); Miss.Code Ann. § 75–24–15(I) (Supp.1981); Mo. Ann. Stat. § 407.025(1) (Vernon 1979); Pa. Stat. Ann. tit. 73, § 201–9.2(a) (Purdon Supp.1982–1983). By contrast, the New York statute contained no language that could be construed as requiring privity—direct contact—between the person injured and the seller. *See* Moldovan, *supra* at 529; *cf. Hyde v. Gen. Motors Corp.*, N.Y. L.J., Oct. 30, 1981, at 5, col. 3, col. 5 (N.Y.Sup.Ct.1981) (defendant's motion to dismiss class action

brought under Act on ground of lack of privity, denied; court noted " 'the world of merchandising is, in brief, no longer a world of direct contact' ") (quoting *Randy Knitwear v. Am. Cyanamid Co.*, 11 N.Y.2d 5, 12, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962)).

The 1980 legislative debate over the amendment of section 349 reflected a recognition that the new bill would authorize claims by indirectly injured parties. Attorney General Abrams acknowledged the need to supplement existing mechanisms to vindicate consumer interests by authorizing and encouraging suit by private businesses and the private bar. Memorandum Of Attorney General (contained in Bill Jacket for ch. 346 of 1980 N.Y.Laws). Assemblyman Strelzin explained that in order to protect consumers who have suffered damages but were not prepared to bring suit, the act authorized suits by others for statutory damages and injunctive relief. N.Y. Gen. Ass. Deb. Trans. at 4432–33 (1980). Then Assemblyman D'Amato cited the extraordinary reach of the new law in lodging his objections:

> We are embarking on something different from the normal litigation where an aggrieved defendant is suing a plaintiff, say, under contract law, or tort law. What we are doing with this bill is we are saying you can represent the Attorney General, we are giving a consumer all the power of an Attorney General, but yet not the responsibilities, not the tools.

N.Y. Gen. Ass. Deb. Trans. at 4441–42 (1980). Certain businesses also noted the deviation from common law by statutorily permitting collaterally injured parties to sue. New York Clearing House Memorandum To Governor (contained in Bill Jacket for ch. 346 of 1980 N.Y.Laws). ("The language is imprecise and ambiguous. For example, the ' . . . any person

who has been injured by reason of a violation of this section . . .' provides no limitation as to whether the injury must be, or has been, *direct or consequential.*") *cf. Givens Practice Guide in McKinney's Cons. Laws, General Business Law* § 349 (Supp. 2000–2001) at 217 (explaining intent of the legislature to enlist "sideswiped" businesses in an otherwise unfairly matched battle to vindicate consumers).

Injuries considered too "indirect" by federal courts analyzing common law proximate causation requirements under the Clayton and RICO Act have been recognized as subject to suit under section 349. Courts have found that proximate cause extends to third parties under section 349 in cases deemed indirect and rejected by federal courts analyzing proximate causation requirements under the Clayton and RICO Acts. *Compare Laborers Local 17*, 191 F.3d at 237 (plaintiff creditor only experiences "direct injury" when it directly relies on misrepresentations of debtor because there is no intervening agency) *with Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d at 264 (business's injury derived from competitors' deceptive statements to safety regulatory authority and public cognizable under 349); *Vitolo v. Dow Corning Corp.*, 166 Misc.2d 717, 634 N.Y.S.2d 362, 366 (N.Y.Sup.Ct.1995).

In *Laborers' Local*, the court of appeals provided several examples of "'directness" and "indirectness," to illustrate injuries falling outside the protective ambit of RICO. By comparison, state court rulings have been much more protective of indirectly injured party recovery under state consumer protection statutes. Rather than being applicable to New York's statute, the following passage demonstrates why *Laborers' Local* does not constrain New York General Business Law section 349. In *Laborers' Local*, the court of appeals for the Second Circuit used the fol-

lowing examples to decide liability—examples not applicable to section 349 cases:

In *Ceribelli v. Elghanayan,* 990 F.2d 62, 64 (2d Cir.1993), we ruled that the plaintiffs could proceed with their RICO claims where the defendants' misrepresentations induced plaintiffs to purchase over-valued stock from the defendants in a cooperative corporation. At the same time, we noted that standing to sue would have been "doubtful" had the plaintiffs simply alleged a diminution in the value of their shares resulting from harm to the corporation subsequent to the purchase. *Id.*

In *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir.1988), a creditor brought a RICO action against the officers of the debtor corporation. The creditor had standing to bring its RICO claims only for "injuries it suffered directly." *Id.* These injuries included damages for defending against frivolous lawsuits initiated by the defendant officers directly against the creditor in an attempt to delay the debt collection as well as to increase the creditor's legal fees. *See id.* at 1099. Additionally, based upon fraudulent misrepresentations by the defendant officers that concealed the availability of a major asset, the plaintiff creditor agreed to a reorganization plan where it relinquished all but 17.5 percent of its allowed claim against the debtor corporation. *Id.* at 1098. This last injury was direct because it was not dependent upon any actual injury the debtor corporation may have suffered as a result of the concealment, but instead arose solely from the misrepresentation by the defendant officers to the plaintiff creditor about the status of the debtor's assets . . . .

In *GICC Capital Corp. v. Technology Finance Group, Inc.,* 30 F.3d 289, 290 (2d Cir.1994), plaintiff accepted a promissory note from defendants as part of an unrelated settlement. During the negotiation of the terms and issuance of the note the defendants did not disclose that, at the same time they were agreeing to cause the corporation to issue the note, they were stripping it of assets, rendering it unable to meet that obligation. *Id.* at 292–93. The defendants' failure to disclose the stripped-down status of the corporation induced the plaintiff to accept the note in settlement. We stated that because of the timing and magnitude of the note, the plaintiffs had RICO standing. *Id.* at 293. In other words, if the plaintiffs had accepted a promissory note from a corporation that was at that time able to repay the note, and later the defendants stripped the corporation, the injury would have been indirect because it would have derived wholly from injuries to the corporation. But, when the promissory note was issued, the corporation had already been stripped of enough assets to undermine the possibility of repayment. Thus, because of the defendants' misrepresentations, the plaintiff in *GICC* (much like the plaintiffs in *Ceribelli* ) accepted an over-valued asset, the note, in exchange for the settlement of their litigation claims. The injury was direct because the plaintiff was immediately injured in the process of negotiating the settlement contract with the defendants, rather than as a derivative result of later injuries to a third party namely, the corporation that issued the note.

New York state consumer fraud act cases have not required the same kind of direct relationship between the fraudulent statements and the ultimate harm as did the court of appeals in *Laborers' Local.* In *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 2001 WL 936210 (S.D.N.Y. Aug.20, 2001), the district court ruled that damages to well-

owners resulting from the defendants' misrepresentations to the general public about the dangers of a highly soluble additive to their gasoline products could also be the basis for a class action brought by the owners of contaminated wells under section 349. The court recognized that such a business plaintiff had standing to sue for recoveries even though the representations which led to their damages were made to federal agencies and the general public to distort knowledge of the general health problems associated with the additive. The court agreed that plaintiffs themselves had been misled by the defendants' misrepresentations. It noted, however, that damages flowed from defendants' widely distributed misrepresentations to the general public in order "to garner consumer acceptance of gasoline containing MTBE." *Id.* at 27. The decision is not conclusive on the issue of whether the plaintiff itself must have been misled by the fraud, but it suggests that such reliance is not necessary. *Id.*

In *Securitron Magnalock Corp.,* the court of appeals for the Second Circuit held that competitors' deceptive statements to safety regulatory authorities, schools and the public about the safety of another business's locks were cognizable under section 349. *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d at 261. Defendants made several false representations about plaintiffs to the public, including letters to a New York City health care facility which, as a result, cancelled its contract with Securitron. The court upheld the jury verdict's award for out of pocket expenses born by Securitron. It found that a business could recover economic losses resulting from statements made to mislead public bodies and its customers.

In *Vitolo v. Dow Corning Corp.,* 166 Misc.2d 717, 634 N.Y.S.2d 362, 366 (N.Y.Sup.Ct.1995), a New York court held that a physician who alleged damage to his practice as a result of negative publicity surrounding silicone breast implant litigation could recover because "the statute, by its terms, gives any person who has been injured due to a violation thereof the right to bring an action." *Vitolo,* 634 N.Y.S.2d at 366–67. The *Vitolo* court explained: "The definition of 'person' is much broader than 'consumer,' embracing all possible plaintiffs, including business persons... There is no requirement of privity, and victims of indirect injuries are permitted to sue under the Act." *Id.*

Acknowledging insurers or health care providers of last resort right to recover, like that of other businesses, fulfills the remedial and deterrent objectives of section 349 by forcing violators to absorb the full economic cost of their conduct. Leading commentators and economists accept the significant "insurance externalites"— i.e., real world impacts—that result from the presence of first party insurance in consumer markets, and the tobacco market in particular. Willard G. Manning et al., *The Costs of Poor Health Habits* (1991) (describing "first party insurance externalities," but ultimately arguing against finding tobacco industry liability in general); Kip Viscusi, *Smoking: Making the Risky Decision* (1992) (same); Jon D. Hanson & Kyle D. Logue, *The Costs of Cigarettes: The Economic Case for Ex Post Incentive Based Regulation,* 107 Yale L.J. 1163, 1175–76, 1124–29 (1998) (arguing in favor of industry liability because of insurance externalities). Allowing manufacturers to shift billions of dollars in medical costs to first party insurers is inconsistent with the design of the New York consumer protection statute; it weakens consumer safety, dilutes incentives to make the marketplace more transparent, and ultimately shifts health care costs to innocent insured nonsmokers. Hanson & Logue, *The Costs of*

*Cigarettes,* 107 Yale L.J. at 1224–26 ("The presence of first party insurance can cause many of the costs of smoking to be externalized by smokers to nonsmokers.").

■ The existence of an action in subrogation does not alter this analysis. *Riordan v. Nationwide Mut. Fire Ins. Co.,* 756 F.Supp. 732, 741 (S.D.N.Y.1990) (statute applies "notwithstanding applicability of other laws, so long as the elements of a claim under its provisions are satisfied."). Individual actions even in subrogation cannot accurately capture many smoking related expenses attributable to defendants' violations of section 349.

The cost of treating non-smoking related disease is also increased by smoking. The additional health care necessary to treat smokers (weakened by their smoking) for non-smoking related diseases is best calculated in the aggregate, as opposed to a case-by-case basis, given the law of large numbers. *See* Michael O. Finkelstein & Bruce Levin, *Statistics for Lawyers* § 5.6–, 5.12, at 170–86 (1990) (confidence intervals); *id.* § 9.1–9.8, at 258–83 (sampling); *id.* § 12.1–12.37, at 323–464 (1990) (regression modeling); David H. Kaye and David A. Freedman, *Reference Guide on Statistics, in Reference Manual, supra,* at 331; Daniel L. Rubinfeld, *Reference Guide on Multiple Regression, in Reference Manual, supra,* at 415; *see generally* Geoffrey R. Norman & David L. Streiner, *PDO Statistics* 27–77 (1986) (statistical inference and regression analysis); David Rosenberg, *Individual Justice and Collectivizing Risk Based Claims in Mass Exposure Cases* (1994) (collectivization generally serves deterrence function of tort liability which is best satisfied by holding defendant liable for average expectant loss causally attributable to tortious conduct); *cf. Int'l Bhd. Of Teamsters, Local 734 v. Philip Morris Inc.,* 196 F.3d 818, 823 (7th Cir.1999) ("Statistical methods could pro-vide a decent answer—likely a more accurate answer than is possible when addressing the equivalent causation question in a single person's suit.").

The parties were permitted to take depositions and conduct discovery of a sufficient sample of Empire's plan members who suffered smoking-related injuries to yield statistically significant conclusions. *See* Part VII B, *infra.* A suit by an insurer on behalf of defrauded consumers for aggregate losses holds violators fully accountable for the costs of their deceptive practices in accordance with section 349's purpose.

Insurance is theoretically different in the sense that the contract between the insurer and the insured, unlike the garden variety consumer-business relationship, anticipates the insured's future injury. This distinction is not compelling in the context of section 349 in light of the provision's deterrence goal supporting private enforcement and the range of activity covered by the statute. *See Karlin v. IVF Am., Inc. et al.,* 93 N.Y.2d 282, 290–91, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999) (citing cases).

Legal causation under the common law has been cabined to protect manufacturers from "crushing liability." *Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 492 N.Y.S.2d 555, 482 N.E.2d 34 (1985); *Hamilton v. Beretta U.S.A. Corp., et al.,* No. 99–7753, 2001 WL 1001284 (2d Cir. Aug. 30, 2001) (denying motion for remand and further discovery for lack of causation); Mari Matsuda, *On Causation,* 100 Colum. L.Rev. 2195 (2000). Foreseeability, closeness in time and space, directness of the sequence of events, the number and kind of intervening causes, privity of contract, degrees of moral blameworthiness, and "no duty rules" are used to limit the range of human actors considered responsible for, or compensable as a result of, a given trage-

dy. Barbara A. Spellman & Alexandra Kincannon, *The Relation Between Counterfactual 'But For' and Causal Reasoning: Experimental Findings and Implications For Juror's Decisions*, 64 Law & Contemp. Probs. 241 (2001) (questioning basis for proximate cause analysis in addition to "but for" cause; lay ability to determine "causation in fact" among multiple causes as competent "as that of the most experienced court"). Matsuda, *On Causation*, 100 Colum. L.Rev. at 2202; *see also* Prosser & Keeton, *Torts* §§ 41, 42 (5th ed.1984).

■ In determining legal causation, section 349 obliges the courts to consider the ability of defendants to avoid, prevent, and redress consumer harm. Whenever the limit to recoverable damages for a plaintiff, it does not bar this plaintiff, the first and only party to bear easily determinable medical costs that naturally result from an insidious consumer fraud. *Cf. Blue Cross & Blue Shield of N.J., Inc.*, 138 F.Supp.2d 357 (E.D.N.Y.2001) (increased premiums passed on to consumers not a bar); Christopher B. Durbin, *"To Say the Greatest Matter in the Simplest Way": A "First Economic Injury" Rule as a Restatement of Directness Standing Requirements in Federal Antitrust Law*, 75 Wash. L.Rev. 549, 565 (2000) (first economically injured should recover). Any more restrictive view would undermine the remedial purposes of the statute.

One commentator has warned that cases allowing businesses to assert consumer standing "are rare and should remain rare" because allowing businesses recovery may preclude consumer awards—arguably eclipsing a goal of consumer protection laws. *See* Edward X. Clinton, Jr., *Do Businesses Have Standing to Sue Under State Consumer Fraud Statutes?*, 20 S. Ill. U. L.J. 385, 400 (1996). The impracticality of individual suits against powerful, well financed defendants such as cigarette producers as well as the collateral source rules of New York, however, discourages direct suits by the consumer. *See Haines v. Liggett Group, Inc.*, 814 F.Supp. 414, 421 (D.N.J.1993) (quoting 1988 memorandum by attorney J. Michael Jordan) ("The aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of [R.J. Reynold's] money, but by making that other [expletive deleted] spend all of his.").

Reading New York law to give full effect to its consumer protection legislation requires enabling this plaintiff insurer to recover losses (that the insured consumer cannot) to discourage statutory fraud and to dispense benefits to consumers in the form of lower premiums and a more transparent marketplace. *See Metro. Life Ins. Co. v. State Comm'n*, 80 A.D.2d 675, 436 N.Y.S.2d 380, 383 (N.Y.App.Div.), *aff'd*, 55 N.Y.2d 758, 447 N.Y.S.2d 245, 431 N.E.2d 970 (1981) ("In construing a statute, the court should consider the mischief sought to be remedied and should favor the construction which will suppress the evil and advance the remedy."). This result favorable to consumer protection is consistent with the general history of consumer fraud statutes, as well as the broad reading given by other state courts interpreting their own consumer protection laws.

### C. General History of Consumer Protection Statutes

At common law, deceptive practices by sellers of goods were subject to weak legal control. *See* Note, *Developments in the Law—Deceptive Advertising*, 80 Harv. L.Rev. 1005, 1018–19 (1967); Note, *The Regulation of Advertising*, 56 Colum.

L.Rev. 1018 (1956). Civil suits for consumers and competitors were limited and expensive. Criminal prosecutions by the state were rare. While courts condemned sellers' misleading conduct in dicta, judicially imposed remedies remained limited. An acceptance of deceptive trade practices was rooted in the history of English markets. Trust was neither given nor expected during the long era of "caveat emptor." Note, *Developments in the Law—Deceptive Advertising,* 80 Harv. L.Rev. at 1006.

Suits founded on the law of fraud or contract presented significant legal obstacles for individual consumers. Among other elements, a consumer plaintiff in a fraud action bore the burden of proving the seller's intent, reasonable reliance, and that representations were not mere "puffery." Jeff Sovern, *Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model,* 52 Ohio St. L.J. 437, 438 (1991). Consumers could bypass some of these requirements in warranty actions, but a business guilty of deceptive conduct often avoided direct liability because consumers could not meet the traditional requirement of privity between buyer and seller. *See, e.g., Huset v. J.I. Case Threshing Mach. Co.,* 120 F. 865 (8th Cir.1903); *but see MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916).

Suits by competitors were limited as well, even though they were accorded more contractual and remedial protections through established commercial law. Jack E. Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?,* 94 Dick. L.Rev. 373, 374 (1990). Even when a competitor's misrepresentations in the marketplace clearly damaged another seller, it was difficult to meet the special damage requirement of an actual diversion of trade. *See Ely–Norris Safe Co. v. Mosler Safe Co.,* 7 F.2d 603, 604 (2d Cir.1925) (Hand, J.), *rev'd on other grounds,* 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578 (1927); Note, *The Law of Commercial Disparagement: Business Defamation's Impotent Ally,* 63 Yale. L.J. 65, 90–96 (1953). Scattered cases supported injunctive relief without actual proof of diversion of trade, and commentary suggested the propriety of businesses seeking such relief on behalf of injured customers. *Cf. Anheuser-Busch Brewing Ass'n v. Fred Miller Brewing Co.,* 87 F. 864 (C.C.E.D.Wis.1898); Milton Handler, *False and Misleading Advertising,* 39 Yale L.J. 22, 36–37 (1929). Such equitable suits were, however, rare.

State criminal actions recognized the inadequacies of common law private enforcement. Note, *The Regulation of Advertising,* 56 Colum. L.Rev. 1018, 1060 (1956). These laws were rarely enforced. Scienter and reliance by consumers had to be proven beyond a reasonable doubt under the criminal law of false pretenses. J. Bishop, 2 Criminal Law §§ 414–15 (9th ed.1923); *cf. Harrison v. United States,* 200 F. 662, 666 (6th Cir.1912) (limiting potential sanction of mail fraud statutes under ch. 312 § 215, 35 Stat. 1130 (1909) (now 18 U.S.C. § 1341 (1994))). Law enforcement agencies lacked the personnel and impetus to prosecute violations of "Printer's Ink" statutes which made "untrue, deceptive or misleading" statements by sellers a criminal misdemeanor. Note, *The Regulation of Advertising,* 56 Colum. L.Rev. at 1058–64 (describing printer's ink statute proscribing false and misleading advertising). A 1956 report indicated that the Brooklyn District Attorney policed the airwaves round-the-clock for violations, but only a few Attorney Generals initiated more than a handful of prosecutions. Note, *The Regulation of Advertising,* 56 Colum. L.Rev. at 1063–64 n.281.

### 1. Modern Consumer Protection Acts

In the post World War II era consumers confronted an increasingly global and sophisticated marketplace. As markets expanded internationally and distribution costs dropped, the physical and cultural distance between buyers and sellers increased. Social norms and the consequences of commercial misconduct to a seller's reputation lost much of the effectiveness they once had in close-knit communities. Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons from the U.S. Experience,* 34 Tex. Int'l L.J. 135 (1999). The judicial tenderness toward deceptive trade practices, rooted in English history, had outlived its usefulness.

State legislatures beginning in the early 1960s enacted broad new measures to compliment Federal Trade Commission prosecution of deceptive practices. Most laws were modeled after uniform model codes— the Uniform Trade Deceptive Practices Act (UTPA), the Uniform Consumer Sales Practices Act (USCSPA), and the Unfair Trade Practices and Consumer Protection Act (UTP–CPA). The broadest (followed by New York and four other states at the time) sweepingly barred all "deceptive or unfair practices." Robert E. Reyna, *State Little FTC Acts and Unfair Methods of Competition,* SB75 ALI–ABA 47 (1997) (describing evolution of Uniform Acts). Today, although they take varying forms, private rights of action exist in all states but Arkansas, Iowa, and North Dakota.

Some state statutes completely revamped old common law obstacles to fraud suits. Many relaxed causation and privity requirements and discarded reliance and intent elements. The majority made small consumer suits more attractive by providing attorney's fees, costs, and statutory and punitive damages. This overhaul of consumer protection law augmented the limited resources of states' Attorney Generals in prosecuting violators. Lisa J. Rodriguez, *Intersection Between UDAP Statutes and Consumer Class Actions,* 1242 PLI/Corp 377 (2000); Note, *Toward Greater Equality in Business Transactions: A Proposal to Extend the Little FTC Acts to Small Businesses,* 96 Harv. L.Rev. 1621, 1640 n.6 (1983). Because state and federal agencies could only prosecute a fraction of deceptive business practices, effective deterrence required a mixture of public and private enforcement. H.R. Rep No 1008, 96th Cong. Sess. 5 (1980) ("[T]he Government simply does not have the resources to police a $2 trillion economy. If deterrence is to be effective the enforcement initiative must come from the private sector."); Myriam E. Gilles, *Reinventing Structure Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights,* 100 Colum. L.Rev. 1384, 1429–30 n.189 (2000) ("[G]overnment routinely looks to private citizens or entities to aid in the enforcement of laws, often on the theory that the most likely source of information about wrongdoing is the citizenry, whose millions of 'eyes on the ground' see far more than investigators ever could.") (citing consumer fraud legislation).

Recognizing that consumers may lack incentives to prosecute small claims, many states created broad provisions, allowing "any person"—not simply consumers—to sue violators of the act. *See* Albert N. Shelden, *State Consumer Protection Laws and Unfair Competition,* SF 74 ALI–ABA 501 508 (2001); Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons From the U.S. Experience, 34 Tex. Int'l L.J. 135 (1999);* Edward Clinton, *Do Businesses Have Standing to Sue Under State Consumer Fraud Statutes?,* 20 S. Ill. U. L.J. 385 (1996). Some statutes expressly limit the reach of their statutes to consumers. *See, e.g.,* Ohio Rev.Code Ann.

§ 1345.02(A) (Baldwin 2000) (coverage limited to "suppliers" in connection with a "consumer transaction"); Haw.Rev.Stat. § 480–2(d) (1992) (coverage limited to "consumers" alleging "unfair or deceptive practices"); D.C.Code § 28–3901(a)(2) (same). Many others broadly define "any person" to include businesses, trusts, insurers and other legal entities injured as a result of a violation. *See generally* 815 Ill. Comp. Stat. § 505/10a(a) (1995) ("[A]ny person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person."); Md. Com. Law Code Ann. §§ 13–408(a) (2000) ("[A]ny person may bring an action to recover for injury or loss."); N.J.Rev.Stat. § 8–19 (1989) (same); Colo.Rev.Stat. § 6–1–113 (2000) (same); N.Y. Gen. Bus. Law § 349(h) (McKinney 1994) (same). State appellate courts differ, but some like New York have given effect to legislative design. They have reworked traditional privity, standing, and causation requirements to accommodate the changing nature of consumer fraud and the need to protect the consumer and others injured.

## 2. State Consumer Statutes Permitting Indirect Injuries

In most jurisdictions, courts have loosened traditional privity requirements so long as the action involves either the "public interest" or a "consumer nexus." *See Maillet v. ATF–Davidson Co., Inc.,* 407 Mass. 185, 552 N.E.2d 95, 98–99 (1990) (privity not required); *Athey Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 436–37 (7th Cir.1996) (reviewing Illinois cases interpreting the Illinois Act to demonstrate actions exist when there is a "consumer nexus"); *Hall v. Walter,* 969 P.2d 224, 235 (Colo.1998) (privity not required so long as action involves public interest); *Group Health Plan v. Philip Morris Inc.,* 621 N.W.2d 2, 11 n. 7 (Minn.2001) (privity

not required, but private action must benefit public); *Vitolo v. Dow Corning Corp.,* 166 Misc.2d 717, 634 N.Y.S.2d 362, 366 (N.Y.Sup.Ct.1995) ("The definition of 'person' is much broader than 'consumer,' embracing all possible plaintiffs, including business persons... There is no requirement of privity, and victims of indirect injuries are permitted to sue under the Act." ); *but compare Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 656 A.2d 1009, 1020 (1995) (no consumer injury necessary) *with Waterbury Petroleum Prods., Inc. v. Canaan Oil and Fuel Co., Inc.,* 193 Conn. 208, 477 A.2d 988 (1984) (requiring privity). Private actions extend in these jurisdictions to consumers and businesses not directly exposed to the fraudulent misrepresentation.

Through judicial interpretation and statutory amendment many states permit suits by victims who have suffered indirect injuries from deceptive practices. Some states, for example, extend coverage of their consumer acts in drug and medical device litigation to include protection to prescribing physicians. *Wash. State Physicians Ins. Exch. v. Fisons Corp.,* 122 Wash.2d 299, 858 P.2d 1054 (1993); *Vitolo v. Dow Corning Corp.,* 166 Misc.2d 717, 634 N.Y.S.2d 362 (N.Y.Sup.Ct.1995). Others grant third party non-consumers the right to sue on behalf of consumers. *Group Health Plan v. Philip Morris Inc.,* 621 N.W.2d at 2 (granting insurer right to recover medical expenditures on behalf of insured); *Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc.,* 214 Ill.App.3d 1073, 158 Ill.Dec. 185, 573 N.E.2d 1370 (1991) (permitting plaintiff-pharmacy to recover from defendants involved in a kickback scheme involving the sale of drugs to nursing home residents), *appeal denied,* 141 Ill.2d 561, 162 Ill.Dec. 510, 580 N.E.2d 136 (1991); *cf. State v. Philip Morris,* 1997 WL 540913 (Md.Cir.Ct. May 21, 1997)

(defining state as a "person" entitled to recover medical expenses under CPA despite finding remoteness under common law). California's consumer protection laws even permit suit absent actual injury. *See* California Business and Professions Code § 17200 (2000); Mark A. Chavez & Kim E. Card, *California's Unfair Competition Law—the Structure and Use of Business and Professions Code § 17200,* 1242 PLI/Corp 405 (2001).

These examples of protective policies in part reflect a practical understanding that injuries in the consumer marketplace are diffuse and attenuated, and that private enforcement is not effective when remedies are limited to directly injured consumers (who lack resources to prosecute small claims) or direct competitors (who in oligopolistic markets shy away from exposing the disadvantages of rival products). *See, e.g., State by Humphrey v. Philip Morris Inc.,* 551 N.W.2d 490, 495 (Minn.1996) (third party not remote because "[t]hese provisions reflect a clear legislative policy encouraging aggressive prosecution of statutory violations"); *Hall v. Walter,* 969 P.2d at 231 (allowing third party suit consistent with other state's laws and Colorado statute's "deterrent and punitive functions"); *Karlin v. IVF America, Inc.,* 93 N.Y.2d 282, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999) ("The reach of these statutes provides needed authority to cope with the numerous, ever changing types of false and deceptive business practices which plague consumers in our State.") (citations omitted); Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons from the U.S. Experience,* 34 Tex. Int'l L.J. 135 (1999) (limited resources of consumers are an obstacle to private enforcement); Robert Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising,* 90 Harv. L.Rev. 661 (1977) (competitors too shy to expose undesirable qualities of rival products in oligopolistic and near monopolistic markets).

Injuries considered too "indirect" by federal courts analyzing proximate causation requirements under the Clayton and RICO Act have increasingly become cognizable under other state consumer protection statutes. *Compare Laborers Local 17,* 191 F.3d at 237 (describing examples of direct and indirect injuries under RICO) *with Hall v. Walter,* 969 P.2d at 225 (upholding claim by landowners against subdivision developers for misrepresentations made to third parties under Colorado statute); *Northwest Airlines, Inc. v. Ticket Exch., Inc.,* 793 F.Supp. 976, 980 (W.D.Wash.1992) (finding airline had claim for injunctive relief under Washington statute against frequent flyer ticket broker for misrepresentations made by the broker to ticket purchasers); *cf. Vitolo,* 634 N.Y.S.2d at 366–67 (plaintiff physician could recover under New York statute for loss of business resulting from negative publicity of silicone breast implant cases). Cases in consumer fraud expand the reach of proximate causation, extending relief to third parties suffering an economic injury. Causation is thus more broadly construed to carry out state policy against fraud on consumers.

Like New York's, other state consumer protection acts do not require a direct relationship between the fraudulent statements and the ultimate harm necessary under common law or the federal RICO statutes. In *Hall v. Walter,* 969 P.2d 224, 225 (Colo.2000), for example, the Colorado Supreme Court sustained a consumer fraud claim by landowners for the diminished value of their property after neighboring subdivision developers mislead purchasers of other properties to believe that an easement existed over the plaintiff's property. The landowners were able to recover under the Colorado consumer

fraud statute for the loss of prospective pasture leases they were negotiating as a result of damages to property sustained after purchasers of other property were misled.

The Massachusetts Supreme Judicial Court in *Maillet v. ATF–Davidson Co., Inc.,* 407 Mass. 185, 552 N.E.2d 95, 98–99 (1990), rejected the idea that a direct relationship must exist between the fraudulent statement and the resulting injury. In *Maillet,* the court did not adopt the defendant's argument that Massachusetts's consumer protection statute, which allows "any ·person" injured by a violation of the statute to bring suit, was limited to consumers in privity with the defendant. *See id.* Accordingly, the court held that the plaintiff, a printing company employee who was injured while operating a printing press, could sue the printing press manufacturer notwithstanding the fact that he was not in privity with the manufacturer and was not the purchaser of the printing press. *See id.*

In *State v. Philip Morris,* 1997 WL 540913 (Md.Cir.Ct. May 21, 1997), the Maryland circuit court drew a sharp distinction between the remedies available under common law fraud and remedies under its consumer protection statute. Relying on many of the same cases and treatises as the court of appeals in *Laborers' Local,* the court determined that the State of Maryland could not recover medical expenses of defrauded consumers under common law fraud, but could recover as a "person" injured "by reason of" violations under the Maryland consumer protection statute. After recounting a similar history, the Minnesota Supreme Court made a similar distinction between common law proximate causation and the consumer action under its statute. *See State by Humphrey v. Philip Morris Inc.,* 551 N.W.2d 490, 495

(Minn.1996) (private insurer suit permissible under state law).

As the court of appeals for the Second Circuit has acknowledged in *Laborers' Local,* the fact that a plaintiff's relationship may be more or less derivative or indirect under the facts does not answer the substantive policy question of what injuries are cognizable under a statute. State cases indicate that as a result of the policy concerns supporting consumer actions, state courts have been willing to interpret the "directness" requirement more leniently than some courts have under the federal RICO statute and at common law.

Consumer fraud cases are outside the restrictive lines drawn by *Laborers' Local.* They allow recovery for damaged reputations, physical injuries, property lease values, and medical expenses despite the intervening acts of deceived consumers. This state trend is consistent with the broad remedial policy and history of these statutes.

### D. Application

Defendants cite several federal circuit court decisions that have rejected claims brought by union health funds and Blue Cross Blue Shield insurers under a variety of federal substantive legal theories. *See, e.g., Int'l Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.,* 196 F.3d 818 (7th Cir.1999) (antitrust and RICO claims); *Or. Laborers Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir.1999) (RICO, antitrust, Oregon's unfair trade practices act, fraud and unjust enrichment); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3d Cir.1999) (antitrust, RICO, fraud, special duty and unjust enrichment); *Tx. Carpenters Health Benefit Fund v. Philip Morris, Inc.,* 199 F.3d 788 (5th Cir.2000) (antitrust and RICO claims).

They argue that plaintiff's direct claim under New York General Business Law section 349 should be dismissed because that statute uses language similar to federal RICO and antitrust statutes. They also make the interrelated argument that the plaintiff lacks standing to sue under section 349.

1. "Remoteness" does not bar plaintiff's claims under section 349

Relying primarily on *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir.1999), defendants seek to set aside plaintiff's New York consumer protection claim arguing that proximate cause is lacking. *See, e.g., Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir.1999), *superseding* 172 F.3d 223 (2d Cir.1999). Four earlier opinions rejected this argument as to this plaintiff's RICO claims and demonstrated why *Laborers Local 17* is not directly applicable. *See, e.g., Blue Cross & Blue Shield of N.J. v. Philip Morris Inc.*, 113 F.Supp.2d 345 (E.D.N.Y.2000); *Nat'l Asbestos Workers Med. Fund. v. Philip Morris Inc.*, 74 F.Supp.2d 221, 224–38 (E.D.N.Y.1999); *Nat'l Asbestos Workers Med. Fund. v. Philip Morris Inc.*, 74 F.Supp.2d 213, 216–20 (E.D.N.Y.1999); *Blue Cross & Blue Shield of N.J. v. Philip Morris Inc.*, 36 F.Supp.2d 560, 568–85 (E.D.N.Y.1999); *see also Blue Cross & Blue Shield of N.J. v. Philip Morris Inc.*, 133 F.Supp.2d 162, 168 (E.D.N.Y.2001) (citing cases).

Defendants' reliance on the ultimate holding in *Laborers Local 17* interpreting federal law to circumscribe the reach of the New York State consumer protection statute is ill conceived. As demonstrated above, the New York statute which is the basis for the jury's verdict favoring plaintiff is not limited by the *Laborers' Local* analysis.

The opinion in *Laborer's Local* emphasized that proximate cause limitations arguably found in the RICO statute do not automatically extend to other statutory causes of action. *Laborers Local 17*, 191 F.3d at 234. The court declared explicitly that: "To avoid confusion in other cases, we re-emphasize that, *depending on the statute*, the existence of common-law proximate causation is neither always necessary, nor always sufficient, to meet the requirement of statutory standing." *Id.* (emphasis added).

American jurisprudence has recognized for well over a century that, "the 'proximate cause' is merely the antecedent event people choose to pick out in order to serve whatever interest they happen to have in the case at hand." Louis Menand, *The Metaphysical Club* 223 (2001). "Proximate cause"—an amorphous concept even under common law—has a different reach in different statutes. *See Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 536–37, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances."); *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 n. 3 (2d Cir.1996); *see also Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99, 103 (1928) (Andrews, J. dissenting). The central question under statutory law, as opposed to common law, is whether "the plaintiff [is] in the category of people *meant by the statute* to be safeguarded" and whether "the harm [is] that *which the act* meant to avoid." *Abrahams v. Young & Rubicam Inc.*, 79 F.3d at 237 n. 3 (emphasis added). The design of the un-

derlying statute is crucial in determining where the proximate cause boundary should be placed.

In *Abrahams,* plaintiff sued for RICO and Connecticut Unfair Deceptive Trade and Practices violations after defendants developed an elaborate bribery and kickback scheme that publicly implicated the plaintiff. Dismissing the civil RICO action for lack of "proximate cause," the court of appeals for the Second Circuit certified the question of whether proximate cause extended to the plaintiff under the state consumer protection statute to the Connecticut Supreme Court, noting the important state policy concerns involved. *Id.* at 239 ("We are reluctant to put either a narrowing or expanding gloss on the statute; not only might it misconstrue Connecticut law, but it might also lead to forum shopping to achieve or avoid federal disposition of unusual CUTPA claims."). The *Abrahams* panel was careful to avoid the interpretative problems posed by an overly mechanical and uniform application of proximate causation:

> [C]onceivably, some statutes might go beyond the common law and create rights of recovery for plaintiffs who are not foreseeable and who are injured by defendants wrongdoing. A legislature could do so if it wished. Were such a statute in issue, substantial problems could arise from the continued use of "proximate cause" language to define when plaintiffs are meant by the legislature to be given a cause of action.

*Id.* at 237 n. 3.

Although the Connecticut Supreme Court ultimately read a narrow application of proximate cause into its state statute, many other state courts as illustrated above interpret their consumer protection statutes broadly. *Compare, e.g., Abrahams v. Young & Rubicam,* 240 Conn. 300, 692 A.2d 709 (1997) *with, e.g., State by*

*Humphrey v. Philip Morris Inc.,* 551 N.W.2d 490, 495 (Minn.1996); *State v. Philip Morris,* 1997 WL 540913 (Md.Cir. Ct. May 21, 1997). *Laborers' Local* itself distinguished its decision from the consumer protection legislation that had conferred the states' Attorneys General authority to recover medical costs. *Laborers Local 17,* 191 F.3d at 243.

The question of whether a private plaintiff states a claim under New York General Business Law section 349 cannot be answered without predicting how the New York Court of Appeals would decide this case based upon the policies undergirding this New York statute. *Reeves v. Am. Broad. Cos. Inc.,* 719 F.2d 602, 605 (2d Cir.1983).

Federal courts of appeals which have applied rigid federal remoteness requirements to state consumer protection laws have generally not touched upon the separate remedial history of these state statutes; moreover, these statutes so construed offer narrower protections than that available in New York. *Compare Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,* 241 F.3d 696, 705 (remote under Washington CPA because limited to federal interpretations of antitrust law); *Or. Laborers Employers Health & Welfare Trust Fund v. Philip Morris Inc.,* 185 F.3d 957 (9th Cir.1999) (action not available under Oregon statute which does not allow cause of action for personal injuries) *with State by Humphrey v. Philip Morris Inc.,* 551 N.W.2d 490, 495 (Minn.1996) (tracing remedial history of statute to find insurer not remote). The analysis which denied these state based claims was based on the premise—as in some RICO cases— that these actions were too derivative and should have been made in subrogation. That analysis does not apply to many state consumer fraud statutes, including New York's. Courts have repeatedly stated

that these more inclusive statutes are to be interpreted broadly, in line with their remedial purpose, regardless of whether a viable claim exists at common law or federal law.

### 2. Plaintiff has standing to sue under section 349

 Defendants make the related argument that the plaintiff lacks standing to sue for increased medical costs under section 349 because it is not a consumer or a competitor of the tobacco industry. This reading of section 349 is misplaced. While the typical case under section 349 generally involves claims arising directly out of a commercial transaction between a plaintiff consumer and a defendant seller, neither the text of the statute nor the case law establishes this requirement. The phrase "commercial transaction" can be found nowhere in the plain language of the statute, and section 349(h) specifically empowers "[a]ny person who has been injured by reason of any violation of this section" to bring an action. New York General Business Law § 349(h) (McKinney 2000). There is no requirement of "privity, and victims of indirect injuries are permitted to sue under the Act." *Vitolo v. Dow,* 166 Misc.2d 717, 724, 634 N.Y.S.2d 362 (N.Y.Sup.Ct.1995), *aff'd in relevant part,* 234 A.D.2d 361, 651 N.Y.S.2d 104 (N.Y.App.Div.1996).

 Courts have held that businesses, in certain instances, may bring actions against others under the statute for deceptive practices, noting that "[t]he critical question [under section 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." *Securitron,* 65 F.3d at 264 (holding that a business competitor could bring an action under the statute as long as the conduct affected the public interest in New York);

*cf. Gaidon,* 94 N.Y.2d at 344, 704 N.Y.S.2d 177, 725 N.E.2d 598 ("In contrast to a private contract dispute as to policy coverage ... the practices before us involved an extensive marketing scheme that had a broader impact on consumers at large") (citations omitted). The import of standing analysis under section 349 has been to distinguish cases where the Act is invoked as a private business tort from cases where the harm alleged impacts the consumer. *See, e.g., Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d at 264; *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig,* No. 00 CV 1898, 2001 WL 936210, *26 (S.D.N.Y. Aug.20, 2001); *Construction Technology, Inc. v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1222 (S.D.N.Y.1989); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988); *Sulner v. General Accident Fire & Life Assur. Corp.,* 122 Misc.2d 597, 471 N.Y.S.2d 794 (N.Y.Sup.Ct.1984).

The conduct and injuries proved by the plaintiff in the instant case affects the public interest of New York. It is sufficiently consumer-oriented to provide plaintiff standing under the statute.

## VI. Subrogation Under Section 349

 Defendants argue that the language of the statute prevents section 349 subrogation suits. They distort language which allows those injured to "bring an action in his own name... to recover his actual damages" to limit private actions to individual suits, rather than through aggregated subrogated claims. Neither the language, history or statutory design of section 349 supports their conclusion.

Section 349(h) reads in relevant part:
In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own

name to enjoin such unlawful act or practice

This phrase as used here and in other New York statutes at the time of passage does not carry defendants' narrow interpretation. The only reasonable reading of the phrase in the context of section 349's broad remedial history is that it was intended to distinguish private actions in the name of an injured party from an action brought by the Attorney General under the earlier subdivisions of the section "in the name of the People of the State of New York." *See* New York General Business Law section 349(b).

The view that a purpose to limit may have been the result of this language has been rejected by courts, commentators, and the legislative history of section 349. *See* Moldovan, *supra* at 559; Memorandum to Governor by William J. O'Connor, Jr.; Memoranda of Assemblyman Jose E. Serrano; *cf.* Hanoch Dagan & James J. White, *Governments, Citizens, and Injurious Industries*, 75 N.Y.U. L.Rev. 354 (2000) (recommending the use of subrogated remedy in government suits for tobacco related health care costs). *But see* Memoranda of Senator Joseph L. Bruno to Governor, N.Y. Legis. Ann., 1980. Subrogation is consistent with the spirit, purpose and the objective of the New York State Legislature.

This interpretation also accords with other statutes at the time section 349 was passed. For example, New York Civil Practice Law and Rules section 2513 provided that a person for whose benefit an undertaking has been given to a public officer, board, or municipal corporation may move for leave to "bring an action in his own name for breach of a condition." N.Y. C.P.L.R. § 2513 (McKinney 1982). This section was designed to protect private parties from situations in which bonds given in the course of judicial proceedings

name the State or a public officer as an obligee. The language was understood to permit a private beneficiary to bring suit upon the bond in his own name, rather than waiting for the named public obligee to sue, provided that he obtains leave from the court. Harold L. Korn, *et al.*, N.Y. Civ. Prac. §§ 2513.01, 2513.02 (2000). Neither the statute nor the case law in the area suggest a design to limit the right to aggregate or subrogate these claims. *See, e.g., Jamaica Sav. Bank v. Florizal Realty Corp.*, 95 Misc.2d 654, 407 N.Y.S.2d 1016 (1978) (undertakings given in the course of judicial proceedings, even though they name the state as obligee, are for all legal intents and purposes designed to protect the rights of and are for the benefit of the private parties to the proceeding.).

General Business Law section 74 governed the licensing of private investigators. It provides that a license may be issued only if the licensee files in the Department of State a surety bond in the sum of $10,000 which bond shall be taken "in the name of the People of the State of New York." N.Y. Gen. Bus. Law § 74(b) (McKinney 1980). The section also provided that any person injured by violation of Article 7 may bring an action against the investigator or on the bond "in his own name to recover damages." N.Y. Gen. Bus. Law § 74(b) (McKinney 1980). The language was also understood to give the beneficiary in addition to the obligee a right of action. *See, e.g., Zampatori v. United Parcel Service*, 125 Misc.2d 405, 479 N.Y.S.2d 470 (N.Y.Sup.Ct.1984) (private action extends to third parties) (citing *Lamb v. U.S. Fidelity & Guaranty Co.*, 162 N.Y.S. 138 (N.Y.Sup.Ct.1916) and *Schauder v. Weiss*, 276 A.D. 967, 94 N.Y.S.2d 748 (N.Y.App.Div.1950)); *see also* Energy Law section 12–110(2) (McKinney 1982) (language permitting suit for private

party's "in his own name" interpreted similarly).

Defendants also argue that plaintiff's equitable subrogation rights are barred by statute under New York Civil Practice Law and Rules section 4545(c). This argument has been fully analyzed and rejected. *See Blue Cross & Blue Shield of N.J., Inc.*, 113 F.Supp.2d at 380; *Nossoughi v. Federated Dep't. Stores, Inc.*, 175 Misc.2d 585, 669 N.Y.S.2d 479, 481–82 (N.Y.Sup.1998). Neither the case law nor the equitable policies underlying the right of subrogation support defendants' contentions.

## VII. Individualized Proof of Causation and Damages

Defendants claim that the plaintiff's use of aggregate proof violates their Constitutional rights and is contrary to New York law. The appropriateness of such proof was demonstrated in extensive memoranda denying defendants' motions for summary judgment. Overseeing three years of coordinated discovery among nine related tobacco cases and two full trials, has only strengthened that demonstration. Statistical proof combined with other evidence is a necessary and pragmatic evidentiary approach to this and other massive tort cases. It is consistent with the defendants' Constitutional rights and legally sufficient to support plaintiff's state law claims.

Both parties were able to vigorously litigate each element of the New York Consumer Protection Act claim. As already stated, the trial lasted over 10 weeks and consumed 8,176 pages of trial testimony and argument. It involved countless expert reports, consultants, and witnesses, and more than 25 volumes containing thousands of exhibits and selections from hundreds of hours of videotaped depositions of smokers.

Defendants' primary objection is that due process and jury trial rights require a particularized form of evidence for each element that—practically speaking—would make this case and cases like it impossible to try. There is little harm in retaining a requirement for "particularistic" evidence of causation and damages in sporadic individual accidents where there are few medical histories and witnesses; such evidence is almost always available and convenient in such litigation. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 832–34 (E.D.N.Y.1984).

In mass exposure cases with hundreds of thousands or millions of injured, however, the cost of such one-on-one procedures is insuperable and unsuitable for either a jury or a bench trial. The consequence of requiring individual proof from each smoker would be to allow defendants who have injured millions of people and caused billions of dollars in damages, to escape all liability. As Professor Rosenberg noted almost a score of years ago, such restrictions in the form of admissible evidence is impractical and unnecessary:

> "The concept of 'particularistic' evidence suggests that there exists a form of proof that can provide direct and actual knowledge of [the parties' conduct]. 'Particularistic' evidence, however, is no less probabilistic than is the statistical evidence that courts purport to shun."

David Rosenberg, *The Causal Connection in Mass Exposure Cases: A 'Public Law' Vision of the Tort System*, 97 Harv. L.Rev. 849, 870 (1984) (footnotes omitted). Many commentators still agree. *See, e.g.*, Peter Tillers, *Symposium: Artificial Intelligence and Judicial Proof*, 22 Cardozo L. Rev. 1365 (2001) (describing tendency of evidence scholars to rely on mathematical and quantitative methods, such as probability theory, statistics, and decision theory). *See, e.g.*, Louis Kaplow & Steven

Shavell, *Fairness Versus Welfare*, 114 Harv. L.Rev. 961, 1203 n.580 (2001); Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329 (1999) (using statistical evidence is a reliable and practical method for mass trial); *see also* Robert G. Bone, *Statistical Adjudication: Rights, Justice, and Utility in a World of Process Scarcity*, 46 Vand. L.Rev. 561 (1993); Johnathan J. Koehler & Daniel Shaviro, *Veridical Verdicts: Increasing Verdict Accuracy Through the Use Of Overtly Probabilistic Evidence and Methods*, 75 Cornell L.Rev. 247, 248 (1990) (although courts should carefully determine the validity of probabilistic evidence, "overtly probabilistic evidence is no less probative of legally material facts than other types of evidence"); Michael J. Saks & Robert F. Kidd, *Human Information Processing and Adjudication: Trial By Heuristics*, 15 L. & Soc'y Rev. 123, 151 (1989–1990) ("Much of the testimony that is commonly thought of as particularistic only seems so. It is far more probabilistic than we normally allow jurors (or judges) to realize."); *cf. The Evolving Role of Statistical Assessments as Evidence in the Courts* 78–79 (Report of the American Academy of Science Panel on Statistical Assessments as Evidence in the Courts) (Stephen E. Fienberg ed.1989) (noting the contradiction between some courts' insistence on evidence that seems certain, and such "probabilistic" institutions as plea bargaining, in which decisions are made on the basis of "probable" outcome). *But see* Laurence H. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Rev. 1329 (1971).

■ As discussed below, the Federal Rules of Civil Procedure and the Federal Rules of Evidence grant district judges authority to shape the nature and scope of admissible evidence for trial. Scientific evidence—like the sampling and statistical extrapolations admitted at trial—is well suited to mass tort actions. It is particularly appropriate in massive consumer fraud cases—so long as it passes the gatekeeping criteria described in the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Many states have provided special mechanisms for handling consumer fraud claims in the aggregate, recognizing that such low value claims cannot be economically tried individually. When, as in the case at bar, the plaintiff is an entity that has suffered its injury in the aggregate, statistical evidence is notably a more accurate and comprehensible form of evidence than would be the testimony of millions of smokers. *See Blue Cross & Blue Shield of N.J., Inc.*, 133 F.Supp.2d at 167 (explaining propriety of statistical extrapolation for entity suffering damages in aggregate); *Blue Cross & Blue Shield of N.J., Inc.*, 36 F.Supp.2d at 575 (E.D.N.Y.1999) ("[t]he aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of possible error"). Extrapolated claim yields in the aggregate will properly estimate total health care costs based upon individual claims. Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329 (1999).

Resolving mass tort disputes on a case-by-case basis may create a systematic bias against plaintiffs because "[w]hile defendants spread the risk of adverse judgments across all test trials, each trial decides the fate of each plaintiff party on a single roll of the dice." David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 430 (2000). The defendant who successfully resolves a mass tort dispute with aggregate tools enjoys the

economic benefit of a final resolution to all proceedings, not just a single case. *Cf. Simon v. Philip Morris Inc.,* 200 F.R.D. 21, 44–46 (E.D.N.Y.2001) (discussing public policy behind aggregation). Defendants' due process rights and jury trial rights were not violated by the combined reliance on aggregate and individual testimony at trial.

## A. Federal Rules of Civil Procedure and Evidence

■ A trial court has wide discretion to manage pre-trial discovery. *See Cruden v. Bank of New York,* 957 F.2d 961, 972 (2d Cir.1992). The Federal Rules of Civil Procedure grant a district court judge flexibility to shape the type and scope of information available before and during a complex trial. *See Manual For Complex Litigation, Third* § 21.422 (2000). The Rules contemplate that the trial or magistrate judge will set time limits, and restrictions on the quantity, scope, and the sequencing of discovery. *See* Fed.R.Civ.P. 1 (Rules to be construed and administered to secure "just, speedy, and inexpensive determination of every action"); Fed. R.Civ.P. 16(b) (limiting the time for discovery in pretrial conference); Fed.R.Civ.P. 26(b)(2) (court to limit "frequency or extent of use of discovery methods."); Fed R. Civ. P. 30(a) & 33 (establishing presumptive limits for depositions and interrogatories); *cf. B.F. Goodrich v. Betkoski,* 99 F.3d 505, 523–24 (2d Cir.1996), *cert. denied sub nom. Zollo Drum Co. v. B.F. Goodrich,* 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998) (not abuse of discretion to limit discovery in CERCLA case involving more than 1,000 parties when extensive discovery would make litigation expense disproportionate to cost of cleaning up landfill).

The Manual For Complex Litigation specifically recommends "limiting discov-ery that is cumulative, duplicative, more convenient or expensive to obtain from another source, or seeks information the party has had ample opportunity to obtain." *Manual For Complex Litigation, Third* § 21.421. A balance must be struck between the burden and expense of discovery sought and its potential benefit. Limiting discovery under the Federal Rules confronts litigants with hard choices. Some discovery necessarily must be foregone or structured in complex litigation if massive cases are to be expeditiously resolved. The goal in a federal court should be to fairly decide claims based on the merits, not on informational costs associated with the deposition of millions of witnesses. *See* Laurens Walker & John Monahan, *Sampling Liability,* 85 Va. L.Rev. 329, 350 (1999) (promoting methods to overcome high information search costs to reach merits). According to the *Manual For Complex Litigation:*

> In determining the appropriate limits, the court will need to confront difficult questions of balancing efficiency and economy against the parties' need to develop an adequate record for summary judgment or trial. The difficulty of this task should not deter the judge from undertaking it, but it underlines the importance of clarifying and understanding the issues in the case before imposing limits.

*Manual For Complex Litigation, Third* § 21.422 (2000). It is particularly important not to deny the courts the ability to take advantage of cost saving through modern scientific techniques for acquiring information. *See, e.g.,* Federal Judicial Center, *Reference Manual, supra; Introduction by Steven Breyer, id.;* Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony, id;* William W. Schwarzer & Joe S. Cecil, *Management of Expert Testimony, id.;* David H. Kaye & David A. Freedom, *Ref-*

*erence Guide On Statistics, id.;* Shari Seidman Diamond, *Reference Guide on Survey Research, id.*

The trial judge is a primary protector against excessive transactional costs in litigation. She or he has broad powers under the Federal Rules of Evidence to regulate the admission of expensive cumulative evidence at trial. *See* Fed.R.Evid. 403 (restricting cumulative evidence); Fed. R.Evid. 611 ("The court shall exercise reasonable control over the mode and order of interrogation of witnesses and presenting evidence"); Fed. R. Evid 1006 (allowing writings, recordings, or photographs which cannot be conveniently examined in court to be presented in the form of "charts, summaries or calculations").

 Although the manner of presenting evidence is best left to counsel, Rule 611 of the Federal Rules of Evidence entrusts the trial judge with the "ultimate responsibility" for the efficient ascertainment of truth by authorizing her or him to exercise reasonable control over the presentation of evidence. *See* Margaret A. Berger, et al., *Evidence* § 611.02 (2000); Original Advisory Committee Note to Fed. R.Evid. 611 ("ultimate responsibility for the effective working of adversary system rest with the trial judge"); Civil Trial Practice Standard 16 ABA (1998) (court should encourage multiple parties to cooperate in, coordinate, and streamline the presentation of evidence). The wording of Rule 611 is broad enough to authorize innovations in the presentation of evidence provided the court considers ways to limit prejudice to the parties. Berger, et al., *Evidence* § 611.02 (citing cases). Trial court decisions under Rule 611 of the Federal Rules of Evidence are "virtually immune" from attack on the grounds of Constitutional due process—particularly in the civil context—and are only challengeable upon a finding that the abuse of discretion

substantially damaged a party's right to a fair trial. *United States v. Baptista–Rodriguez,* 17 F.3d 1354, 1357 (11th Cir.1994).

### B. Appropriateness of Sampling and Survey Techniques

Sampling and survey techniques are a well-accepted alternative for the trial judge facing crippling discovery and evidentiary costs. *Manual for Complex Litigation, Third* §§ 21.422 ("statistical sampling techniques may be used to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce"), 21.493 ("The use of acceptable sampling techniques in lieu of discovery and presentation of voluminous data from the entire population, may produce substantial savings in time and expense."); David H. Kaye & David A. Freedom, *Reference Guide On Statistics, supra.;* Shari Seidman Diamond, *Reference Guide on Survey Research, supra;* Hans Zeisel & David Kaye, Statistics for Social Science and Public Policy, Empirical Methods in Law and Litigation (1997); *see, also, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (using statistical data to prove discrimination in jury selection) *Zippo Manufacturing Co. v. Rogers Imports,* 216 F.Supp. 670 (S.D.N.Y. 1963) (relying on sampling methodology); *United States v. 449 Cases Containing Tomato Paste,* 212 F.2d 567 (2d Cir.1954) (approving inspector's testing of samples, rather than requiring the opening of all cases); *Capaci v. Katz & Besthoff, Inc.,* 711 F.2d 647, 653–57 (5th Cir.1983)(using census data in gender discrimination case); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,* 628 F.2d 500 (5th Cir.1980) (using statistical sampling in trademark infringement suit); *Stewart v. General Motors Corp.,* 542 F.2d 445 (7th Cir.1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); *In re Estate of Fer-*

dinand E. Marcos, Human Rights Litigation, 910 F.Supp. 1460 (D.Haw.1995) (using sampling to determine compensatory damages through extrapolating "exposure" element of liability), aff'd sub nom Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996); Ageloff v. Delta Airlines, Inc., 860 F.2d 379 (11th Cir.1988) (using evidence of life-expectancy tables to determine damages); G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538–40 (11th Cir.1985) (using expert testimony for profit projections based on industry norms); Newberg on Class Actions § 10.05 (when aggregate proof of damages is sought to be proved on behalf of a class, no special or unique rules of evidence are involved.). In some cases sampling techniques may prove the only practicable way to collect and present relevant data. See Harolds Stores v. Dillard Dep't Stores, 82 F.3d 1533, 1544 (10th Cir.1996); Manual for Complex Litigation, Third § 21.493 (2000).

▮▮▮▮ Surveys and sampling techniques have been admitted in a large variety of actions to establish causation so long as they accord with Daubert and Rule 702 of the Federal Rules of Evidence. Fed. R.Evid. 702; Daubert, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see also Reference Manual, supra; Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical data to prove discrimination in jury selection); Zippo Manufacturing Co. v. Rogers Imports, Inc., 216 F.Supp. at 670 (survey data in trademark infringement case). Properly developed survey evidence is admissible subject to arguments regarding its weight and probative value. Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 224 (2d Cir. 1999) (citing cases); McNeilab Inc. v. American Home Prods. Corp., 848 F.2d 34, 38 (2d. Cir.1988). The question of whether such surveys in combination with other evidence is legally sufficient is to be left to the jury in accordance with the "general standards for judgment as a matter of law," once the court has determined the study is viable under Federal Rule of Evidence 702. In re Joint E. & S. District Asbestos Litig., 52 F.3d 1124, 1132 (2d Cir.1995) (permitting statistical evidence to go to jury); see generally Michael O. Finklestein & Bruce Levin, Statistics for Lawyers vii (2d ed.2001) (wide expansion of statistics used in trials over past decade).

American manufacturers now mass produce goods for consumption by millions using new chemical compounds and processes, creating the potential for mass injury. Modern adjudicatory tools must be adapted to allow the fair, efficient, effective and responsive resolution of the claims of these injured masses. See, e.g., In re DES Cases, 789 F.Supp. 548 (E.D.N.Y. 1992) (market share liability applied in suits for defective design of diethylstilbestrol (DES)); In re Joint E. & S. District Asbestos Litig., 726 F.Supp. 426 (E.D.N.Y. 1989) (computation of damages for Brooklyn Navy Yard asbestos victims); In re "Agent Orange" Product Liability Litig., 689 F.Supp. 1250 (E.D.N.Y.1988) (distribution scheme for victims of agent orange); see also Manual for Complex Litigation, Third § 33.21–29 (2000) (mass torts); Kenneth R. Feinberg, Lawyering in Mass Torts, 97 Colum. L.Rev. 2177, 2177 ("mass torts [litigation] requires more than the traditional view of lawyering ...."); see generally Richard A. Nagareda, In the Aftermath of the Mass Tort Class Action, 85 Geo. L.J. 295 (1996).

State legislatures, courts, and commentators have recognized that aggregate tools are especially helpful in the context of consumer fraud, when the low value of specific claims or the litigation advantages of a well-financed defendant can discourage individuals from pressing their claims in court. See Fla. Stat. Ann. § 409.910(9)

(West 1998) (developing aggregate procedures for recovery of medical expenses resulting from alleged tobacco fraud); Md. Code Ann., Health–Gen. I § 15–120 (West 1998) (same); Vt. Stat. Ann. tit. 33, § 1911(f)(5) (same); *see also Group Health Plan v. Philip Morris Inc.,* 621 N.W.2d. at 15 ("To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory actions."); *Walker v. Nat'l. Recovery Inc.,* 200 F.3d 500 (7th Cir.1999); *Agency for Health Care Admin. v. Associated Indus. of Florida,* 678 So.2d 1239 (Fla.1996) (aggregation of fraud claims to recover medical expenses conformed to due process), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1245, 137 L.Ed.2d 327 (1997); Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons From the U.S. Experience,* 34 Tex. Int'l L.J. 135 (1999) (limited resources and incentives for consumers acting individually); Laurens Walker & John Monahan, *Sampling Liability,* 85 Va. L.Rev. 329 (1999).

The Defendants cite *City of Birmingham v. American Tobacco Co.,* 10 F.Supp.2d 1257 (N.D.Ala.1998), for the proposition that the plaintiff must provide the factual circumstances for each smoker on whose behalf it now sues. That case does not address the issue of statistical sampling. The court held—at the pleading stage—that the city could not recover for all employees under its state statute, only for some. The denial of summary judgment as to some of the city's claims in that case did not disallow the use of aggregate proof to try the remaining issues.

In the bulk of the third-party tobacco cases that contemplated discovery and trial, courts properly limited the level of individual proof available. *Northwest Laborers Employers Health and Sec. Trust Fund v. Philip Morris Inc.,* No. C97–849 (W.D.Wash. Mar. 18, 1999) (Order On Defendants' Motion to Compel Discovery Re Individual Fund Participants) ("[d]efendants' motion to compel discovery regarding individual fund participants would impose an enormous burden on all parties and effectively would bring the litigation to a halt"); *West Virginia–Ohio Valley Area IBEW Welfare Fund v. American Tobacco Co.,* No. 97–0978 (S.D.W.Va., May, 1999) (rejecting defendants' motion to depose every member of union trust fund); *In re Mike Moore, Attorney General ex rel. State of Mississippi Tobacco Litigation,* No. 94–1429 (Miss. Apr. 18, 1996) (Order on Defendant's Motion to Compel Initial Discovery Limited Number of Medicaid Recipients on Health Care Provided by the State of Mississippi) (permitting disclosure of identity and information of limited number of Medicaid recipients); *State v. Philip Morris Inc.,* No. Cl.–94–8565 (Minn. Dec. 21, 1995) (Order to Compel Limited Depositions of Medicaid Recipients) (limiting depositions for defendants); *see Sampling Liability,* 85 Va. L.Rev. 329 (1999) (approving the use of sampling in pre-trial and at trial in Tobacco litigation). Such limits on individualized proof is used in other cases as well. *See* Howard Ross Cabot & Alan A. Matheson Jr., *The Use of Statistics to Wrest Control Over the Trial of Mass Damage Claims,* 7 Inside Litig. at 16 (Mar.1993) (dealing with approximately 17,000 property damage subrogation lawsuits arising from a chemical explosion, proposed trial plan would use stratified sampling of the insurance claims at issue).

Against this backdrop, the use of statistical evidence in the instant case violates neither the constitutional guarantee of due process nor the constitutional right to a jury trial. *See In re Chevron U.S.A., Inc.,* 109 F.3d at 1020 ("[t]he applicability of inferential statistics have long been recognized by courts"; collecting cases); Lau-

rens Walker & John Monahan, *Sampling Damages*, 83 Iowa L.Rev. 545 (1998) ("[A] complete solution of the numbers problem in mass torts can only be achieved by ... randomly sampling damages without apology."); *cf. In re Matter of Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293, 1304 (7th Cir.1995) (noting with approval idea of a "sample of trials"); *Consorti v. Armstrong World Industries*, 72 F.3d 1003 (2d. Cir. 1995) ("consolidation permits the federal court to furnish trials in hundreds, even thousands of cases it might otherwise not reach for many years. If carefully and properly administered ... consolidation is also capable of producing, with efficiency and greatly reduced expense for all parties, a fairer, more rational and evenhanded delivery of justice."), *rev'd on other grounds* 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996).

The use of aggregate proof at trial was consistent with due process and jury trial rights. It was legally sufficient to support the plaintiff's verdict under New York General Business Law section 349.

### 1. Due Process

 Defendants claim that due process required individual adjudication of millions of smokers' claims implicated in the action, and discovery from millions more—family, friends, coworkers, and doctors. The reasons for rejecting this approach were set out at length in a memorandum denying summary judgment. *See Blue Cross & Blue Shield of N.J., Inc.*, 113 F.Supp.2d at 372.

At summary judgment, the court balanced the due process interests of allowing more individualized discovery and more individualized proof at trial. *Id.* It was determined that the interests of the private parties, the accuracy of the procedures, and an efficient use of court resources counseled in favor of using statistical models along with individual deposition lay testimony, expert testimony, and documentary evidence. *Id.* (*citing Connecticut v. Doehr*, 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991)); *see, also e.g., Hilao*, 103 F.3d at 786 (balancing due process interests). Michael J. Saks & Peter David Blanck, *Justice Improved*, 44 Stan. L. Rev. 815, 826–32 (1992) (statistical sampling comports with due process in mass aggregation cases). That reasoning is worth recounting here.

The court first noted that consideration of the private interests involved favored the utilization of statistics:

Tobacco admittedly has an interest in not paying for damages in excess of what its alleged misconduct may have caused; that interest would be furthered by Tobacco's confronting (before the jury) each of the hundreds of thousands of Empire's insured who suffered smoking-related illnesses about their reliance on Tobacco's misstatements and omissions, and about their discovery of their injuries (so as to precisely determine in each instance when the statute of limitations started to run).

Practical considerations temper the weight of Tobacco's interest, however. If such a process were undertaken, it would have to continue beyond all lives in being. Assuming Tobacco was willing to expend the resources and monies necessary both in discovery and at trial to mount such an undertaking, the litigation costs in doing so would far exceed any monies saved by avoiding erroneous payments given Empire's four year limitation on recovery...

The interest of Empire in avoiding the additional litigation costs that would arise if Tobacco was permitted to confront each Plan member at trial is enormous, particularly since Empire is

presently a nonprofit entity with limited annual income appropriately dedicated to covering Plan members' health care costs. The necessary additional litigation costs Empire would have to bear would consume much of any recovery from Tobacco, making continued pursuit of the litigation fruitless . . .

The interests of the injured smoking Plan members must be considered. Requiring individual proof as to each claim would unnecessarily intrude on the lives of hundreds of thousands of people. Examining each of the grains of sand on the beach is too burdensome.

*Blue Cross & Blue Shield of N.J.*, 113 F.Supp.2d at 372–73.

The court ruled the second element also supported allowing statistical proof subject to *Daubert* challenges:

The parties have been permitted to take depositions and conduct discovery of a sufficient sample of Empire's Plan members who suffered smoking-related injuries to yield statistically significant conclusions. It is plaintiff's well supported contention that this will ensure that the ultimate damages projected by its statistical model will be within 10 percent (either higher or lower) of the actual damage caused by Tobacco's alleged misconduct.

In addition to statistical evidence, parties will be permitted to present to the jury relevant lay testimony, expert testimony, and documentary evidence—subject to the constraints of the Federal Rules of Evidence and the practical considerations of trial management.

*Id.* at 374–75.

Finally, considering the court resources involved, it found that the third prong strongly weighed in favor of such a proceeding:

A consolidated trial with full presentation of the individual facts of each of Empire's subrogated claims relating to smoking-related illnesses before a single jury would be unmanageable. Similarly, hundreds-of-thousands of separate trials brought by Empire to adjudicate individually the subrogation claim arising from each Plan member who has suffered a smoking–related illness would prove unnecessarily burdensome; it would "clog the docket of the district court for years."

*Id.* at 375–77 (citations omitted).

Extensive discussions among the parties and the court assessed how to best present the combination of aggregate and individualized evidence to the jury. The parties were ordered to confer with statisticians and survey research experts concerning the kinds of samples that would yield statistically valid inferences about whether smokers subscribing to Empire were in fact deceived by statements made by the Tobacco industry. Defendants' experts originally proposed a randomized sample of 1,600 subscribers. The parties resubmitted extensive briefing and expert affidavits measuring the appropriate sample size after some factors were left for individual discovery. Defendants' expert revised estimate called for 624 subscribers in person with standardized questions and without witness preparation. Plaintiff's expert proposed a sample of 156 depositions taken telephonically, with alternating question and answers, and with witness preparation.

A sample of 156 deponents was determined to be consistent with statistical norms. Depositions were to be taken in person for three hours, with standardized questions, and without witness preparation, to preserve the sanctity of the sample. Deposition responses were then coded blindly in accordance with scientific

norms and results were extrapolated. Relevant portions of depositions were played to the jury. The deficiencies in the study and of deposition testimony were thoroughly developed on cross-examination and in the defendants' case-in-chief.

Other models were used. One expert presented models quantifying that portion of smoking-related costs attributable to defendants. Applying economic models, he created a "counter factual" world to calculate a "conduct attributable fraction" for each year, representing the portion of medical costs due to smoking related illnesses resulting from defendants' fraud. The smoking attributable costs calculated by other experts were also utilized to determine damages on a per annum basis. Several thorough and prolonged hearings (in this case and in related actions) established that these statistical models satisfied *Daubert* and could be used in combination with individualized evidence to satisfy each element of the plaintiff's action. *See, e.g., Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc., et al.,* No. 98 CV 3287, 2000 WL 1880283 (E.D.N.Y. Dec.27, 2000); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* No. 98 CV 3287, 2000 WL 1805359 (E.D.N.Y. Dec. 11, 2000); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* No. 98 CV 3287, 2000 WL 1738338 (E.D.N.Y. Nov.1, 2000); *Falise v. The Am. Tobacco Co.,* No. 99 CV 7392, 2000 WL 1804602 (E.D.N.Y. Nov.30, 2000); *Falise v. The Am. Tobacco Co.,* 107 F.Supp.2d 200 (E.D.N.Y. July 28, 2000).

Excellent graphs, charts, schematics, as well as underlying data, were made available to the jury, which was fully attentive and appeared to understand its significance. All of the experts (both plaintiff's and defendants') were authorities in their fields. They had published extensively in peer reviewed journals. Each expert had prepared full reports with data and analysis supplied to the other side. Each was evaluated carefully for compliance with *Daubert* and Rule 702 requirements. The presentation of their evidence and cross-examination was thorough and comprehensive.

At trial, this statistical evidence was presented along with other studies commissioned by government and non-government agencies. Individual deposition and other testimony was also used. Relevant portions of videotaped deposition testimony of individual subscribers was played to the jury on a theater size screen by both sides. All evidence was subject to thorough cross examination, criticism by defense experts, and two full days of persuasive closing argument before the jury.

After three years of coordinated pretrial discovery, months of negotiations between the parties and the Magistrate Judge on the fair use of aggregate procedures, two postponed trial dates to revise and permit more discovery, and two separate vigorously contested trials consuming almost five months of trial time—exposing every expert, lay witness, and document to the most detailed scrutiny—adequate procedures have afforded the parties all necessary due process.

2. Seventh Amendment Jury Trial Right

 To accept defendants' second contention—that the use of aggregate proof in plaintiff's direct and subrogation claims violates the Seventh Amendment—would require concluding that the Constitution establishes fixed limitations on the methods of proof a particular party may offer. Welding such a horse and buggy interpretation into trials in the computer-guided-rocket age seems somewhat far-fetched. Courts cannot ignore and deny themselves

what the rest of the world relies upon in fact-finding.

The Seventh Amendment of the Constitution protects the right to a jury trial. It reads:

In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

The Amendment "was designed to preserve the basic institution of a jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even at the time of adoption so widely among common-law jurisdictions." *See Galloway v. United States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); *Ex parte Peterson,* 253 U.S. 300, 309–12, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

Over the past two centuries, the primary concern in interpreting the Seventh Amendment has been to preserve the jury's role as a finder of fact, without Constitutionally freezing evidentiary and trial procedures. Justice Brandeis expounded on the necessity of adapting the jury trial right to contemporary realities in *Ex parte Peterson:*

[The Seventh Amendment] does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence.... New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right. The limitation imposed by the Amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury not be interfered with.

*Id.* at 309–10, 40 S.Ct. 543 (citations omitted); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 436 n. 20, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("If the meaning of the Seventh Amendment were fixed at 1791, our civil juries would remain, as they unquestionably were at common law, twelve good men and true.") (internal citations and quotations omitted); Margaret L. Moses, *What The Jury Must Hear: The Supreme Court's Evolving Seventh Amendment Jurisprudence,* 68 Geo. Wash. L.Rev. 183, 199–208 (2000) (citing cases); Austin Wakeman Scott, *The Reform of Civil Procedure,* 31 Harv. L.Rev. 669, 671–78 (1918) (describing historical evolution of jury trials).

The historical record demonstrates that the Framer's main objective in drafting the Seventh Amendment was to limit the ability of an appellate court to overturn a civil jury's finding of fact. There is no indication they intended to constrain the trial judge's substantial discretion to employ appropriate procedural mechanisms in managing a trial so as to arrive at the truth—or as near to the truth as time and humankind's limitations allow. *See Simon v. Philip Morris Inc.,* 200 F.R.D. 21, 33 (E.D.N.Y.2001).

Chief Justice Rehnquist has observed that whatever procedural changes are made, they cannot be allowed to invade the "jury's province"—its fact-finding power. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 345–46, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting). Yet, the jury has unquestionably had much of its fact-finding authority attenuated indirectly through various "procedural devices." Fed. R.Evid. 104(a) (judicial discretion to bar evidence that fails conditional relevancy); Fed.R.Evid. 403 (judicial discretion to bar

cumulative, irrelevant, prejudicial information); Moses, *What The Jury Must Hear*, 68 Geo. Wash. L.Rev. at 205; Edward J. Imwinkelreid, *Trial Judges—Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate The Credibility or the Weight of the Testimony?*, 84 Marq. L.Rev. 1 (2000) (*Daubert* may limit jury's fact finding role); Lisa S. Meyer, *Taking the Complexity out of Complex Litigation: Preserving the Constitutional Right to a Civil Jury Trial*, Val. U.L.Rev. 337 (1993) (juries replaced by bench trials in complex cases). The increasing use of bench trials, *Daubert* hearings, summary judgment, and directed verdict—as authorized by appellate courts—to limit fact finding and set aside verdicts poses more of a threat to the continued viability of the Seventh Amendment jury trial, than the development of new fair procedures that accord with modern statistical and informational gathering techniques for making factual determinations.

Courts must be especially careful not to hobble the jury system by excluding potential evidence. Prematurely cutting off the flow of evidence to the jury favors defendants, leading not only to a violation of the Constitution, but a tilting of the scales of justice. *See, e.g.,* John Caher, *Court Seen As Slow In Expanding Tort Claims, Criminal Defendant's Civil Rights*, N.Y. L.J., Jul. 24, 2001, at 1 (describing trend against private litigants in decisions by New York Court of Appeals); Margaret A. Berger, *Upsetting the Balance Between Adverse Interests: Expert Testimony in Toxic Tort Litigation*, 64 L. & Contemp. Probs. 289, 325 (2001) (discussing *Daubert*; "The Supreme Court's trilogy on expert proof has empowered federal judges to adjust the balance in toxic tort cases to favor defendants . . . by . . . converting rulings on the admissibility of evidence into rulings on the sufficiency of evidence. The result is that the critical issue of causation in toxic tort is being decided by federal judges, not . . . jurors, and in pretrial proceedings, rather than at trial."); Kevin M. Clermont & Theodore Eisenberg, *Appeal from Jury or Judge Trial: Defendants' Advantage*, 3 Am. L. & Econ. Rev. 125, 128 (2001) (appellate courts are more inclined to overturn plaintiff's verdicts because of perceived pro-plaintiff bias by juries); Kevin M. Clermont & Theodore Eisenberg, *Anti–Plaintiff Bias in the Federal Appellate Courts*, 84 Judicature 128 (2000) (same); Lucinda M. Finley, *Guarding the Gate To The Courthouse: How Trial Judges are Using Their Evidentiary Screening Role to Remake Tort Causation Rules*, 49 DePaul L.Rev. 335, 341–42 (1999) (evidentiary gate-keeping "substantially increases plaintiffs' burden of proving individual causation, and it also furthers the trend in toxic tort cases to shift the allocation of power away from juries to judges"); Samuel Issacharoff & George Loewenstein, *Second Thoughts About Summary Judgment*, 100 Yale L.J. 73, 75 (1990) ("[L]iberalized summary judgment inhibits the filing of otherwise meritorious suits and results in a wealth transfer from plaintiffs as a class to defendants as a class"); Jeffrey W. Stempel, *A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process*, 49 Ohio St. L.J. 95, 99 (1988) (describing Supreme Court's 1986 trilogy of summary judgment cases as "faulty and ill-conceived . . . in light of purposes for which civil litigation system exists"). Such a trend favoring defendants by limiting juries is also inconsistent with the Federal Rules of Evidence that were designed to enhance the search for truth by making more data available to the trier. Fortunately, the court of ap-

peals for the Second Circuit generally has resisted this tendency towards obfuscation of fact finding by juries. *See, e.g., Robinson v. Metro–N. Commuter R.R. Co.,* 267 F.3d 147, 169 n. 13 (2d Cir.2001) (approving jury bifurcation); *In re Joint E. & S. District Asbestos Litig.,* 52 F.3d 1124, 1132 (2d Cir.1995) (permitting statistical evidence to go to jury).

Many authorities demonstrate that jury fact-finding is enhanced by the use of aggregating techniques. *See Manual for Complex Litigation, Third* § 22.3, at 136 ("Although the presentation of the evidence at trial is normally controlled by the strategies and tactics of counsel, in complex litigation other considerations also require attention, primarily jury comprehension and the length of the trial. These are not unrelated concepts, since a shorter trial promotes jury comprehension, and effective presentation saves times."); Joe S. Cecil, Valerie P. Hans & Elizabeth C. Wiggins, *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials,* 40 Am. U.L.Rev. 727, 750–64 (1991) ("[T]he overall picture of the jury [in complex cases] that emerges from the available data indicates that juries are capable of deciding even very complex cases, especially if procedures to enhance jury competence are used."). The essential functions of the Seventh Amendment are enhanced, not limited, by procedures which streamline and focus jury fact-finding. The jurors in this district are generally educated and aware of current technology; they would justly feel insulted by being denied modern fact finding techniques. *See* Part II, *supra.*

Relying on Fifth Circuit decisions, defendants claim that the use of aggregate statistics violated their constitutional right to a jury trial. This view is misplaced. The argument was addressed and rejected in the context of plaintiff's subrogated RICO claims.

Accepting for arguments sake the conclusions reached by the court of appeals for the Fifth Circuit in *Cimino[ v. Raymark Industries, Inc.,* 151 F.3d 297 (5th Cir.1998)] and *Fibreboard*—that the right to a jury is violated by the use of statistics to extrapolate findings of liability from a group of representative plaintiffs to all plaintiffs (in place of individual jury verdicts as to each plaintiff)—that question is not presented here. The present case does not arise in the posture of *Cimino* and *Fibreboard.* It involves non-class claims of a single plaintiff against five defendants. Empire is advancing its own subrogated interests; no representative group of plaintiffs have been selected to litigate from whose verdicts liability determinations will be extrapolated to the remaining plaintiffs . . .

*Blue Cross & Blue Shield of N.J., Inc.,* 113 F.Supp.2d at 375 (citations omitted).

The present case involves a single plaintiff requiring an aggregate determination of economic losses resulting from defendants' actions. The Fifth Circuit has generally approved aggregate statistical techniques to calculate lump sum damage figures in mass tort cases, despite rejecting their use in class actions where damages needs to be apportioned among individuals. *Compare In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir.1990) ("there will inevitably be individual class members whose recovery will be greater or lesser than it would have been if tried alone") *with Watson v. Shell Oil Co.,* 979 F.2d 1014, 1018 (5th Cir.1992) (aggregation proper to determine total compensatory damages as a means to determine punitive damages). The result in *Fibreboard* in part was premised on the fact that individuals in a plaintiff class may be

subjected to the risk of underpayment or overpayment because of sampling. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 787–88 (Rymer, J., dissenting) (9th Cir. 1996); Walker & Monahan, *Sampling Liability*, 85 Va. L.Rev. at 345. Whatever the merit of that conclusion, that threat is not posed when a single business sues for aggregate harm it has suffered.

Defendants received their fair jury trial. The problems posed by "bellwether trials" or "extrapolated verdicts" are not before this court. Ample evidence was introduced at trial on every element of every claim before a single jury. Defendants were not prevented from introducing individual forms of evidence. The videotaped testimony of 156 individual subscribers of plaintiff and others was available to and introduced by both parties. All of this information was subject to skilled cross examination lasting several weeks, and supported by defendants' own statistical models, experts, counter designations and lay testimony in their case-in-chief.

Excluding information on the ground that jurors are too ignorant to evaluate it properly may have been appropriate in England at a time when a rigid class society created a wide gap between royal judges and commoner juries, but it is inconsistent "with the realities of our modern American informed citizens and the responsibility of independent thought in a working society." *United States v. Shonubi*, 895 F.Supp. 460, 493 (E.D.N.Y.1995), *rev'd on other grounds* 103 F.3d 1085 (2d Cir.1997); *see also* James Bradley Thayer, *Select Cases on Evidence at the Common Law* 1 (1892) (" 'Reasoning, the rational method of settling disputed questions, is the modern substitute for certain formal and mechanical tests which flourished among our ancestors for centuries, and in the midst of which the trial by jury emerged.' ") (quoting Thayer, *"Law and Fact" in Jury Trials*, 4 Harv. L.Rev. 147, 157 (1890)).

3. *Erie*

Defendants also raise the specter of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), arguing that the federal procedure which permits the aggregation of claims cannot be used in applying substantive state law. They contend that claims must, as a matter of substantive law, be based upon proof of individual injury by an individual's smoking, reliance, and disease. This claim has already been considered and rejected. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 133 F.Supp.2d at 172 (E.D.N.Y.2001).

Defendants cite no ruling New York case which holds that state substantive law will not permit the use of modern aggregation forensic tools to support an action under General Business Law section 349. Aggregation is appropriate in light of New York Court of Appeals decisions relaxing traditional barriers to common law fraud under the statute. Both the legislative history and the policies undergirding the New York statute mandate this conclusion.

The *Erie* question is better posed as a question of legal sufficiency: Can the substantive elements of this New York statute be satisfied by a mixture of statistical and individualized evidence? *See Blue Cross & Blue Shield of N.J., Inc.*, 133 F.Supp.2d at 172 ("While statistical methods certainly ease the plaintiff's ability to satisfy its burden of proof, it does not alter the elements of New York State substantive law. The plaintiff still must prove to a jury that defendants' misconduct caused specific injuries to subscribers in violation of the substantive elements of its state law claims"). If the answer is "yes," no *Erie* question is presented by federal evidentiary procedures which allow for the use of

aggregate proof. *See Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987) ("Rules which incidentally affect litigants's substantive rights do not violate this provision if reasonably necessary to maintain the integrity of that system of rules.").

Ample authority supports the conclusion that statistical calculations here satisfy both federal and New York standards of evidentiary sufficiency and do not alter substantive elements of state law. Robert A. Barter & Vincent C. Alexander, *Evidence in New York State and Federal Courts* § 300.3(b) (1999) (standard of legal sufficiency same in New York and Federal practice). The issue of sufficiency was not squarely before the *Daubert* Court, but Justice Blackmun's opinion did briefly address it. Once units of scientific evidence pass the admissibility threshold, he noted, the "appropriate" means of challenging those which appear shaky or unreliable include the "traditional" devices of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 113 S.Ct. at 2798.

Even though New York state courts have not fully embraced *Daubert*, the relaxation of common law requirements of reliance and causation in section 349 demonstrates that appropriate statistical sampling along with individual testimony may be legally sufficient to prove elements of consumer fraud, as it has been in discrimination, tax assessment determinations, DNA sampling and criminal cases. *See, e.g., People v. Chesler*, 91 Misc.2d 551, 398 N.Y.S.2d 320 (N.Y.Sup.Ct.1977) (sampling to determine discrimination in jury pool); *860 Executive Towers v. Bd. of Assessors of Nassau County*, 84 Misc.2d 525, 377 N.Y.S.2d 863 (N.Y.Sup.Ct.1975) (equal probability sampling in tax assessment determinations appropriate); *People v. Wesley*, 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451 (N.Y.1994) (DNA identification analysis proper); *People v. Shi Fu Huang*, 145 Misc.2d 513, 546 N.Y.S.2d 920 (N.Y.Co.Ct.1989) (DNA evidence admissible subject to lowest proposed figure of probability); *People v. Victory*, 166 Misc.2d 549, 631 N.Y.S.2d 805 (N.Y.City Crim.Ct.1995) (scientific reliability of admitting retrograde extrapolation of alcohol in bloodstream); *People v. McLaurin*, 157 Misc.2d 783, 598 N.Y.S.2d 911 (N.Y.Sup. Ct.1993) (extrapolation permitted to determine amount of drugs); *see also e.g., Fisch on New York Evidence* § 1018 (2d ed.1977); Randolpf N. Jonkait, Harold Baer, Jr., E. Stewart Jones, Jr., & Edward J. Imwinkelried, *New York Evidentiary Foundations*, 112–13 (1998) (somewhat higher standards for admissibility under New York law than under federal law); Robert A. Barker & Vincent C. Alexander, *Evidence in New York State and Federal Courts* (1996) (same).

The New York Court of Appeals has never ruled that "individualized proof" is the only way to prove causation and damages under a section 349 claim. In the recent case of *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000), the Court of Appeals underscored that reliance need not be proven under section 349 and alluded to Supreme Court cases which found that a showing of causation could be satisfied by proving a "fraud-on-the market," a theory friendly to modern sampling techniques:

Similarly, in the securities context, proof of reliance is not required where a duty to disclose material information has been breached, or where there are material omissions or misstatements in a proxy statement. Rather, the materiality of the omission or misstatement satisfies the causation requirement (*see, e.g., Affiliated Ute Citizens v. United States*,

406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 ¶breach of duty to disclose: the "obligation to disclose and (the) withholding of a material fact establish the requisite element of causation in fact"; *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 ¶misstatement or material omission in proxy statement: "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress" ).

*Stutman v. Chem. Bank,* 95 N.Y.2d at 29 n. 2, 709 N.Y.S.2d 892, 731 N.E.2d 608.

New York cases suggest that aggregation techniques are available when the issues are reliance, causation and damages. *See, e.g., King v. Club Med., Inc.,* 76 A.D.2d 123, 430 N.Y.S.2d 65, 67–68 (N.Y.App.Div.1980) (finding that issues of reliance should not ordinarily defeat class certification and collecting cases); *Weil v. Long Island Savings Bank,* 200 F.R.D. 164, 175 (E.D.N.Y.2001) (approving class action including section 349 claims; "generally, reliance issues do not predominate, as the focus in this inquiry is on the common question of liability"); *cf. Bertulli v. Indep. Assoc. of Continental Pilots,* 242 F.3d 290, 298 (5th Cir.2001) (class certification proper even though damages determinations individualized); *Broder v. MBNA Corp.,* 281 A.D.2d 369, 722 N.Y.S.2d 524 (N.Y.App.Div.2001) (*accord* ).

Discussing developments in consumer protection law (including New York), Professor Issacaroff trenchantly noted a similar trend:

The review of the substantive law of reliance shows that reliance is most often proven inferentially or based on an objective reasonable person standard, as opposed to being proven through direct evidence of subjective individual understandings. Under such circumstances . . . there are no significant procedural hurdles to aggregate treatment of most consumer claims.

Issacharoff, *The Vexing Problem of Reliance In Consumer Class Actions,* 74 Tul. L.Rev. at 1633.

The Supreme Court of Minnesota, interpreting its own consumer protection statute, has discussed why the relaxation of common law requirements necessitate the use of evidentiary innovations such as statistical sampling:

To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory actions. Moreover, we are confident that the legislature would not have authorized private damages actions such as this, where the alleged misrepresentations are claimed to have affected a large number of consumers, while retaining a strict burden of proof that depends on evidence of individual consumer reliance.

*Group Health Plan v. Philip Morris Inc.,* 621 N.W.2d at 15.

Defendants misread *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 679 N.Y.S.2d 593 (N.Y.App.Div.1998), for the proposition that a Section 349 claim cannot be supported using a combination of aggregate and individual evidence. In *Small,* the First Department refused to certify a class of more than a million nicotine dependant smokers. There, unlike the present action, plaintiffs claimed economic injuries resulting from addiction-induced purchases. The Appellate Division denied certification stating "each plaintiff would need to show that he relied on defendants' misleading statements on addiction to prove injury, and thus the trial, as a class, would be unmanageable." *Id.* at 601. The

*Small* court never decided the appropriateness of statistical sampling. *Id.* Moreover, as discussed above, this case of one plaintiff does not pose the same problems of apportionment that statistical sampling would present in a class action.

On the *Small* appeal, the New York Court of Appeals confirmed that "deception" and "actual injury" must be proven separately under a section 349 claim but because of its limited review powers over certification decisions, it never addressed the Appellate Division's possible assumption that such claims required individualized proof as to huge members of those claiming injury or that statistical tools were prohibited in such adjudications. *See* Arthur Karger, *The Powers of the New York Court of Appeals* 57 (2001) (Appellate Division's decision against certification is discretionary, subject to almost no review by the New York Court of Appeals); *cf.* David Siegel, New York Practice, 234–38 (3d ed.1999) (describing factors considered in deciding whether to certify a state class action and attitude of judges).

There is no reason to believe that the New York Court of Appeals would construe the New York statute so strictly as to prevent modern modes of proof. As already noted, the policy and history of statutes like New York's support the use of aggregate tools to adjudicate these disputes. *Group Health Plan v. Philip Morris Inc.,* 621 N.W.2d at 15; *cf. Walker v. National Recovery Inc.,* 200 F.3d 500 (7th Cir.1999) (a court cannot simply assume subjective effect of defendant's conduct on class, but may depend on experts and survey evidence to establish class members were mislead under the Fair Debt Collection Practices Act); Samuel Issacharoff, *The Vexing Problem of Reliance In Consumer Class Actions,* 74 Tul. L.Rev. 1633 (2000).

The procedural use of sampling is consistent with New York state substantive law. No *Erie* question is presented with respect to evidentiary issues.

VIII. Preemption

Defendants next claim is that the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. sections 1331–40 ("FCLAA"), preempts New York consumer act claims. Defendants also assert that compliance with federal regulations bars plaintiff's claim under General Business Law section 349(d). Both arguments are rejected for the reasons set forth below.

A. Preemption Under Federal Law

 State law that conflicts with federal law is without effect. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, ——, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl.2.

 Because plaintiff's claims involve regulations that lie at the heart of the states' traditional police powers—consumer protection—plaintiff's claims "[are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Reilly,* 533 U.S. at ——, 121 S.Ct. at 2414; *see also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (*citing Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 2001 WL 936210, *10 (S.D.N.Y. Aug.20, 2001) (citing cases). The purpose of Congress is the "ultimate touchstone" of preemption analysis. *Malone v. White Motor Corp.,* 435 U.S. 497,

504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (*quoting Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963)). The scope of the preemption provision must "give effect to a reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lorillard,* 533 U.S. at ——, 121 S.Ct. at 2441 (Stevens, J., concurring in part, concurring in the judgment in part, and dissenting in part).

The FCLAA's preemption provision reads:

(a) Additional statements

No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.

(b) State regulations

No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

15 U.S.C. § 1334 (1994).

 The Supreme Court has interpreted this current language more broadly then the original version. *Cipollone,* 505 U.S. at 520, 112 S.Ct. 2608 ("the plain language of the preemption provision in the 1969 Act is much broader" then the 1965 Act). The provision preempts state laws with respect to all "advertising and promotion." *Reilly,* 533 U.S. at ——, 121 S.Ct. at 2416.

Boundaries were defined in *Cipollone v. Liggett Group, Inc.* Giving the clause a "fair but narrow reading," the court ruled a common law damages action alleging a failure to provide adequate warnings was preempted, but that the Act did not preempt "claims based on express warranty, *intentional fraud, and misrepresentation,* or conspiracy." *Cipollone,* 505 U.S. at 530–31, 112 S.Ct. 2608 (emphasis added).

The plaintiffs in *Cipollone* alleged that the manufacturers had engaged in two distinct types of misrepresentation. The Court found that a claim for fraudulent misrepresentation premised upon an allegation that the advertising practices of the cigarette manufacturers neutralized the effect of federally-mandated warning labels was preempted by the 1969 Act. It held that such a theory of fraudulent misrepresentation was inextricably related to a theory of failure to warn and was similarly preempted.

The Court recognized, however, an important distinction between fraudulent misrepresentation claims associated with advertising and other forms or venues of misrepresentation. Examples of the latter type of misrepresentation, such as evidence that the cigarette manufacturers concealed material facts from administrative agencies, or that they included false statements of material fact, *e.g.*, carbon monoxide or tar levels, in their advertising, would not be preempted by the 1969 Act. The Court reasoned that this second type of fraudulent misrepresentation claim was predicated on more general state law duties to disclose material facts, rather than on advertising and promotion. To further clarify the distinction, the Supreme Court stated that in the former type of alleged fraudulent misrepresentation, such as billboards, print media and the like were "obligations with respect to advertising or promotion" and a state law claim premised upon the breach of that duty would be preempted. Claims that an advertisement contains a false statement of a material fact, in contrast, are not "predicated upon a duty based on smoking and

health, but rather on a more general obligation—the duty not to deceive." *Id.* at 527–28, 112 S.Ct. 2608.

The recent decision in *Reilly* reaffirmed this distinction. The Supreme Court distinguished between a Massachusetts law regulating the outdoor and point of sale advertising of cigarettes, and laws of general applicability. The Court found the Massachusetts law targeted an area expressly preempted by Congress—advertising connected to smoking and health—by attempting to limit youth exposure to cigarette advertisements.

> Congress prohibited state cigarette advertising regulations motivated by concerns about smoking and health.... At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette advertising is intertwined with the concern about smoking and health.

*Id.* at 2417.

The Court emphasized that generally applicable obligations and laws were not preempted:

> Although Congress has taken into account the unique concerns about cigarette smoking and health in advertising, there is no indication that Congress intended to displace local community interests in general regulations of the location of billboards or large marquee advertising, or that Congress intended cigarette advertisers to be afforded special treatment in that regard. Restrictions on the location and size of advertisements that apply to cigarettes on equal terms with other products appear to be outside the ambit of the pre-emption provision. Such restrictions are not "based on smoking and health."

 General Business Law section 349 is a law of general application, which imposes a duty not unlike the one permitted in *Cipollone*—a duty not to deceive.

While deliberate intent to deceive is not required under section 349, the ample evidence of that deliberate and premeditated design resonates with a finding of nonpreemption. *Cf.* N.Y. Gen. Bus. L. § 349(h) ("The court may in its discretion increase the award of damages ... if the court finds the defendant willingly or knowingly violated the section").

The jury in the instant case was suitably instructed on misleading in a charge which read in relevant part:

> In order to prove its claim under General Business Law Section 349, Empire must prove that the challenged acts or practices were misrepresentations and were misleading in a material way. "Misleading" means that the acts or practices must have been likely to mislead a reasonable consumer acting reasonably under the circumstances. "Misleading in a material way," means that the misrepresentations must be ones which would reasonably be expected to be important to a reasonable consumer in making his or her decision.

Trial Tr. at 8127–18.

As to preemption, the court charged fully that it constituted a complete bar to damages. *See also* Part VIII B *supra.* It said:

> "Preemption" is a doctrine of federal law that limits the claims that plaintiffs can make in this case. You need to understand this limitation in order to perform your duties as jurors.

> The doctrine of preemption arises from the federal law enacted by the United States Congress effective July 1, 1969. Congress mandated that every pack of cigarettes bear a specific warning label written by Congress itself. Later, Con-

gress required that warnings appear in each cigarette brand advertisement.

The law thus requires that tobacco companies put warnings on the cigarettes packages that they sell and the law dictates what the warnings say. Tobacco companies were not permitted to change those warnings. The law also says that since July 1, 1969, these warnings are legally adequate to warn the public, including smokers, of any adverse health consequences of smoking.

You may not award damages in this case based on any claim that a particular defendant should have included additional or more clearly stated warnings on their cigarette packages or in their advertisements in addition to the governmental required warnings on their cigarette packages or in their advertisements.

This is not an affirmative defense. Defendants do not have the burden of proving preemption.

Trial Tr. at 8250–51.

Sufficient evidence of deceptive practices not covered by preemption were presented to the jury to permit a finding of liability. *See* Part IV *supra.* Federal preemption under the Labeling Act does not avoid the obligation imposed on a manufacturer by section 349.

## B. State Regulatory Compliance Defense

The New York Consumer Protection Act has a specific exclusion for acts that are subject to, and in compliance with, federal rules, regulations or statutes. Section 349(d) of the Act provides:

In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any other official department, division, commission or agency of the United States as such rules, regulations and statutes are interpreted by the federal trade commission, or such department, division, commission or agency or the federal courts.

New York General Business Law § 349(d); *see also Morelli v. Weider Nutrition Group, Inc.,* 275 A.D.2d 607, 712 N.Y.S.2d 551 (N.Y.App.Div.2000) (excluding practices subject to and in "compliance with Federal rules, regulations, or statutes").

While New York statutory fraud does provide an independent regulatory compliance defense, that defense does not extend to acts that are not related to the regulated conduct. *Compare Small v. Lorillard Tobacco Co.,* 176 Misc.2d 413, 672 N.Y.S.2d 601, 609 n. 3 (1997), *rev'd on other grounds,* 252 A.D.2d 1, 679 N.Y.S.2d 593 (N.Y.App.Div.1998) ("While defendants argue that … the GBL provides a complete defense to one who complies with the rules of a federal statute, in this case the Labeling Act untruthful utterances … are never entitled to such protection.") *and Demarco v. Bay Ridge Car World, Ltd.,* 169 A.D.2d 808, 565 N.Y.S.2d 176, 177 (N.Y.App.Div.1991) (recall notice made pursuant to federal law not a defense to General Business Law section 349 claim for failure to disclose automobile's susceptibility to engine fires) *with Porr v. NYNEX Corp.,* 230 A.D.2d 564, 660 N.Y.S.2d 440 (N.Y.App.Div.1997) (defendant's practice of rounding off point barred when that would have directly contradicted federal regulation which permitted the practice); *Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1173 (S.D.N.Y.1996) (barring section 349 claim when AT & T had specifically complied with related rules under Communications Act); *cf.* American Law Institute, *2 Reporter's Study on Enter-*

*prise Responsibility For Personal Injury* 83–110 (1991) (recommending compliance preclusion for those risks that specifically have been addressed and regulated by the administrative program).

Defendants claim that their compliance with the detailed federal laws and regulations governing the industry is a complete defense to plaintiff's consumer protection claims under section 349. *See* New York General Business Law § 349(d). They contend that they are supervised by a panoply of government regulations such as statutorily proscribed health warnings, advertising limitations, research demands on Health and Human Services to report to Congress regarding tobacco addiction research, Federal Trade Commission reports, and requirements to report lists of cigarette ingredients. They claim that their compliance with federal law and regulations is a complete defense under the Act.

The cases relied upon by defendants support only the proposition that when a federal statute or regulation directly negates the scope of New York's General Business Law will it be preempted. *See, e.g., Porr v. NYNEX Corp.,* 230 A.D.2d 564, 660 N.Y.S.2d 440 (N.Y.App.Div.1997); *Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1173 (S.D.N.Y.1996). In the case of federal regulatory programs designed to set a minimum standard there is in principle no difficulty in allowing tort liability to play a supplemental role in addressing those risks that remain after the minimum standard has been satisfied. *See generally* Robert L. Rabin, *Reassessing Regulatory Compliance,* 88 Geo. L.J.2049, 2084 (2000). No case holds that when deception is alleged, unrelated regulatory supervision immunizes. *Blue Cross & Blue Shield of N.J., Inc.,* 133 F.Supp.2d at 176.

Congress intended by its laws and by federal regulations to protect consumers by locking the front door against open deception in advertising and labeling. It did not seek to prevent the state cop on the beat from catching those breaking in the back door using the burglar's tools of deceit.

Here, plaintiff did not base their claims on a duty or failure to warn, but upon a duty not to deceive or make false statements. *Cf. Falise v. Am. Tobacco Co.,* 94 F.Supp.2d 316, 356–57 (2000). Regulatory compliance with federal agencies does not warrant a blanket protection from such claims under the New York state statute or any federal statute or regulation.

The jury was properly instructed about section 349. After reading the affirmative defense provision under section 349(d), the Court stated:

> If you find that defendants have proven by a preponderance of the evidence that any of the challenged acts or practices complied with such federal regulation, then you must find for the defendants as to that act or practice, and you may award no damages based on that act or practice...

Sufficient evidence supported a finding of liability despite the regulatory compliance defense available under 349 and the federal preemption doctrine. The jury's findings were proper.

## IX. Evidence Sufficient To Support Low Tar Fraud

Defendants argue that plaintiff did not introduce legally sufficient evidence to show that consumers were misled about the dangers of "light," low tar and filtered cigarettes. They also claim that plaintiff did not show what damages were connected with this kind of fraud. Both of these arguments fail.

Evidence of defendants' "low tar fraud" is only part of the misleading conduct re-

garding the health risks of cigarettes that supports violations of New York General Business Law section 349. It is not a separate legal claim. The attempt to inhibit marketing of a "safer" cigarette—amply supported by the trial record—is intertwined with and a part of a more general design to deceive consumers about the effects of smoking. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.*, 2001 WL 811930, at *1 (E.D.N.Y. May 22, 2001).

Defendants' attack on this evidence bears on its weight—a jury question—not its legal sufficiency. The evidence demonstrated that defendants misrepresented material facts regarding a variety of subjects relating to the safety of their products—causation, addiction, the full scope of the risk, the nature of the constituents of tobacco, the quality of their own knowledge of tobacco products, and efforts to eliminate hazards. Evidence of a "low tar fraud" was also supported by the trial record. This evidence, as a whole, was properly considered by the jury.

■ Defendants' second contention—that plaintiff failed to properly link its damage estimates to a "low tar fraud"—is also without basis. Evidence may show the extent of the damages "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *United States Football League v. National Football League*, 842 F.2d 1335, 1379 (2d Cir.1988). The jury was provided with expert testimony to permit a reasonable and principled basis for calculating and apportioning damages. Hearings established that this testimony satisfied *Daubert* and Rule 702 of the Federal Rules Of Evidence. *See* Parts IV C 2 & VII *supra.*

## A. Evidence Admissible to Support General Deception

The jury could reasonably conclude that defendants misled the public about the actual benefits of light, low tar and filtered cigarettes as actually smoked. The trial record showed that defendants knew that low tar cigarettes did not deliver any significant health benefits. *See generally* Part IV B & C *supra.* Evidence also supported the conclusion that defendants were highly informed and deliberately exploited this deceptive phenomenon. *Id.* The evidence demonstrated that defendants promoted low-tar cigarettes while knowing there was no significant health benefits or that any benefit was far less then the defendants led the public to believe. *Id.* The evidence also proved that these practices were designed to intercept quitters. According to a 1977 BATCo memorandum:

> All work in this area should be directed towards providing consumer reassurance about cigarettes and the smoking habit. This can be provided in different ways, for example, by claiming low deliveries, by the perception of low deliveries and by the perception of mildness. Furthermore advertising for low delivery or traditional brands should be constructed in ways so as not to provoke anxiety about health but to alleviate it and enable the smoker to feel assured about the habit and confident in maintaining it over time.

PTX 9666; *see also e.g.,* PTX 1042 (1978 Brown & Williamson Memorandum: "Perhaps answers to another question 'How do people stop smoking?' could lend insight into the creation of new products. Having answers to this latter question, we might then design products to 'intercept' people who are trying to give up smoking."). Evidence and expert testimony showed that these messages appeared in public communications. Plaintiff's subscribers testified

that they purchased and smoked more low tar cigarettes rather than quit in reliance upon these communications. *See* Part IV C 2 B. The evidence was properly admitted for the jury to consider as part of a broader deception alleged against the defendants regarding the safety of their cigarettes.

### B. Evidence Admissible to Support Damages

Defendants also argue that Empire did not introduce evidence sufficient to connect their damages to the alleged fraud relating to low tar cigarettes. They argue the damage model relied on by the jury could not capture the damages flowing from any misrepresentations about the safety of low tar cigarettes. They claim that this model was based only on the premise that low tar cigarettes were safer.

These arguments are misplaced. Damage models were subject to *Daubert* hearings and found admissible. Evidence demonstrated that models were only in part premised on defendants' decades long practice not to produce safer cigarettes for fear that, by addressing safety, companies would alert smokers to the gravity of the health risks and thereby reduce total industry sales. The jury could properly decide that the low tar issue was relevant to such a model.

The damage model was sufficiently flexible for the jury to account for or to discount these damages. Models isolated damages based on defendants' deceptive practices from damages that resulted from the failure to produce real low tar yielding cigarettes as smoked by real people. These models were also subject to lengthy cross examination and critique by defense experts. The final verdict was conservative and demonstrated that the jurors understood these models, rejected some or all in whole or in part, and made adjustments based on sound economic principles.

### X. Evidence of Post–1980 Deceptive Acts and Practices

Defendants' argument that plaintiff did not introduce evidence of defendants' misconduct after 1980 is inconsistent with the trial record. Plaintiff introduced many examples of defendants' misrepresentations made after 1980; each of them reached nationwide audiences—including those in New York—through massive media efforts. Actions of defendants prior to 1980 was also introduced as evidence of continuing activities after 1980. Separate models confined damages to post–1980 conduct to specifically support plaintiff's section 349 claim.

### A. Law

 In private suits, the New York Consumer Protection Act applies prospectively to misconduct that occurred after 1980. *Blue Cross & Blue Shield of N.J., Inc.,* 133 F.Supp.2d at 166–67. In theory, plaintiff had the right not to be injured even before it could sue on its own behalf for those injuries. The rationale for limiting retroactive application of such statutes is to avoid affecting a defendant's antecedent obligations. They were obligated not to violate the Act long before 1980. New York Statutes Law § 53 (McKinney 1994) (commentary). Practically speaking, however, "[s]o long as the statute was enforceable solely by government it was largely precatory." *Falise v. Am. Tobacco Co.,* 2000 WL 1880303, No. CV 97–7640 (E.D.N.Y. Dec. 27, 2000); *see, e.g., Buccino v. Continental Assurance Co.,* 578 F.Supp. 1518 (S.D.N.Y.1983); *cf. Hughes Aircraft Co. v. United States,* 520 U.S. 939, 950, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (refusing to apply statutory amendment expanding private party standing for qui tam suits retroactively because it "essentially create[d] a new cause of action");

*Landgraf v. USI Film Prods.,* 511 U.S. 244, 268, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see also* Howard M. Erichson, *Coattail Class Actions: Reflections On Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation,* 34 U.C. Davis L.Rev. 1, 41 (2000) (describing the effectiveness of combining public and private actions in enhancing deterrence). Only when private persons could bring suits and the powerful enforcement agency of the plaintiff bar was brought to bear did the Act provide teeth. Defendants were thus only responsible under section 349 for post–1980 misconduct.

### B. *Application*

All of the pre–1980 evidence introduced on the RICO and common law fraud claims would have been admissible had proof of the plaintiff been directed only to the section 349 claim. The context was relevant to understanding what happened after 1980. *Cf. United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (past activities relevant to demonstrating present conduct in Title VII claims, but "the critical question is whether any present violation exists").

 The jury was presented with more than sufficient examples of post–1980 misconduct to support its verdict. Examples of such evidence include statements widely disseminated through television, conferences, and letter campaigns:

— On October 20, 1983, a representative for the defendants referring to smoking causation, told a national audience on the ABC program "20/20": "The case is still open. The jury has not come in." PTX 1444.

— The next year, a representative of the defendants published a pamphlet, entitled, "The Cigarette Controversy: Why More Research Is Needed," which

stated: "There is a cigarette controversy. The *causal theory*—that cigarette smoking causes or is the cause of the various diseases with which it is reported to be related statistically—is just that, a theory." PTX 1444.

— On May 16, 1988, a representative on behalf of the defendants published a press release titled, "Claims That Cigarettes Are Addictive Contradict Common Sense," which stated: "Smoking is a truly personal choice which can be stopped if and when a person decides to do so." PTX 1645.

— In a January 11, 1989 interview on the ABC program, "Good Morning America," a representative speaking on behalf of the defendants stated the following on behalf of the tobacco industry: "[T]he causative relationship has not been established ... I can't allow the claim that smoking is addictive to go unchallenged.... It's a matter of willpower." PTX 9508.

— Walker Merryman, a representative on behalf of the defendants wrote the following in an article published on April 27, 1989, in the Washington Times: "The difference between cigarette smoking and true addictions to hard drugs is stark and compelling." PTX 9791.

— In 1992, Philip Morris published a pamphlet entitled, "Tobacco Issues and Answers," that stated: "Those who term smoking an addiction do so for ideological, not scientific reasons." PTX 5786.

— On April 15, 1994, the day after its and other CEOs from the industry testified before Congress that smoking was not addictive, Philip Morris placed an advertisement in the New York Times that stated: "Fact: Philip Morris does not believe smoking is addictive." PTX 1814.

— In 1996, the parent company of Brown and Williamson stated in the *Wall Street Journal:* "We haven't concealed, we do not conceal, and we will never conceal. We have no internal research which proves that smoking causes lung cancer or other diseases, or indeed, that smoking is addictive." PTX 1862.

Letters were sent after 1980 to consumers all across the country, including many New York residents. Articles written in the 1970s denying causal connection between smoking and cancer were re-circulated in post–1980 mailings. They included the following statements:

— "Despite all the research going on, medical science has not found any conclusive evidence that any element in cigarettes, tobacco, or tobacco smoke causes human disease."

— "We firmly believe that cigarettes have been unfairly blamed as a cause of human disease."

— "With the numerous attacks being made on smoking, it is indeed refreshing to read a letter such as yours and to be reassured that not everyone has accepted without question the adverse publicity the tobacco industry has received... Throughout the years, the public has received a largely one-sided view of the questions that have arisen about tobacco ... Through a series of messages appearing in national newspapers and magazines, we are attempting to provide our side of such public issues as ... passive smoking, smoking courtesy and smoking and health."

— "[I]n the absence of the identification of the processes or mechanisms involved in cancer causation, together with experimental animal evidence which raises questions regarding causation, we believe that scientific proof that cigarette smoking causes chronic diseases in humans is still lacking."

PTX 9853 (including over 150 letters).

Post–1980 communications reached elementary school teachers and principals. A 1990 form letter responding to inquiries from fifth grade students at a New York elementary school reads in relevant part:

"[T]he simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to many unanswered smoking and health questions—and the fundamental causes of the diseases often statistically associated with smoking—we believe can only be determined through much more scientific research."

PTX 1688.

Evidence confirmed that these communications were part of a general policy for the 1980s and beyond. *See, e.g.,* PTX 1042 (Summarizing plans in conference titled "Marketing in the 80's": "Overall marketing policy will be such that we maintain faith and confidence in the smoking habit, whether brand choice is traditional or not in particular markets. This means that B.A.T. will not remain on the defensive, by simply reacting to alleged 'health' hazards and related competitive challenges: instead we shall actively seek out all worthwhile prospects for brand and product reassurance in marketing throughout the world.").

Sufficient evidence of post–1980 misconduct was introduced to support the jury's verdict.

Defendants' alternative argument that plaintiff did not prove that an individual subscriber specifically relied on specific post–1980 statements ignores this court's prior rulings. As it held in rejecting defendants' suggested individual reliance re-

quirement in *Falise v. American Tobacco Co.*:

> Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually misled millions of people. From the perspective of the fraudulent actors, clear efficiencies are gained by co-opting the media and other outlets of information as unwitting tools for the pervasive scheme.

94 F.Supp.2d 316, 335 (E.D.N.Y.2000). This analysis applies even more forcefully in the context of a section 349 claim—which does not require a showing of specific reliance. *See* Parts V and VII B 3, *supra; Stutman v. Chem. Bank*, 95 N.Y.2d at 29 n. 2, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000); *Group Health Plan v. Philip Morris Inc.*, 621 N.W.2d at 15 ("[W]e are confident that the legislature would not have authorized private damages actions such as this, where the alleged misrepresentations are claimed to have affected a large number of consumers, while retaining a strict burden of proof that depends on evidence of individual consumer reliance"); Issacharoff, *The Vexing Problem of Reliance In Consumer Class Actions*, 74 Tul. L.Rev. at 1633.

The jury could have concluded that plaintiff proved at trial a massive scheme to distort the body of public knowledge that continued long after 1980. The law cannot accept defendants' attempt to void liability because their deceptive scheme was so pervasive and far-reaching that it needed to rely on national media to reach its intended audience and because it totally perverted the flow of information to the public. Proof that each individual sub-scriber was personally addressed by the defendant was not necessary. The evidence was sufficient to support the conclusion that this fraud caused damage to plaintiff recoverable under section 349.

## XI. *Statute of Limitations*

Defendants contend that plaintiff's direct claim under section 349 is time-barred. They argue that plaintiff's damages after 1997 were not sufficiently independent of damages that took place before that date and consequently that no new limitations period should accrue. Defendants' claim is rejected.

### A. *Law*

 Actions under Section 349 are subject to a three year statute which begins to run when the injury occurs. *Gaidon*, 96 N.Y.2d 201, 208, 727 N.Y.S.2d 30, 750 N.E.2d 1078 (2001). Determination of the limitations period is complicated when the same pattern of activity results in multiple injuries spread over time. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir.1988) ( "Even after injury has occurred ... and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property."). For RICO actions the court of appeals for the Second Circuit has adopted the "separate accrual rule under which a new claim accrues, triggering a new four-year limitations period, each time a plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir.1995).

The court of appeals has held that "[a] necessary corollary of the separate accrual rule is that [a] plaintiff may only recover

for injuries discovered or discoverable within four years of the time suit is brought." *Bingham v. Zolt,* 66 F.3d at 560. As long as separate and independent injuries continue to flow "from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year 'window' before suit was filed, together, of course, with any provable future damages." *Id.* The statute of limitations inquiry thus looks to "when the [plaintiff] sustained the alleged injur[ies] for which they seek redress." *In re Merrill Lynch Ltd. Partnerships Litig.* ("Merrill Lynch II"), 154 F.3d 56, 59 (2d Cir.1998) (per curiam).

The rule of *Bingham* and *Merrill Lynch* applies with even more force in section 349 claims. Mass consumer fraud cases involve "multiple and independent injuries" that can occur over a "broad period of time." *Bingham v. Zolt,* 66 F.3d at 560. A high percentage of civil RICO cases involve fraud claims. *See Sedima v. Imrex Co. Inc.,* 473 U.S. 479, 499, n. 16, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (most civil RICO claims involve underlying fraud offense); 1 A. Mathews, A. Weissman, & J. Sturc, *Civil RICO Litigation,* 1–6 (2d ed.1992) (citing Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 243 (1985)) (as of 1985, approximately 90% of civil RICO cases resulting in a published decision involved mail, wire, or securities fraud as a predicate offense).

The New York Court of Appeals' most recent discussion of the subject, *Gaidon v. Guardian Life Insurance Company of America,* supports this application of the statute of limitations for section 349 claims. There, the court ruled that section 349 injuries accrued only when plaintiffs were called upon to pay the additional premiums, after "an extensive marketing campaign" designed by defendants to lure plaintiff's into purchasing policies advertising vanishing premiums. *Gaidon,* 96 N.Y.2d at 210, 727 N.Y.S.2d 30, 750 N.E.2d 1078. The court concluded that timely actions were commenced within three years after plaintiffs were required to pay additional premiums. *Id.* at 211, 727 N.Y.S.2d 30, 750 N.E.2d 1078.

Defendants rely on *Bingham v. Zolt* for the proposition that defendants' ongoing misstatements were not sufficiently independent of each other to support a separate accrual rule. Defendants' reliance on *Bingham* is misplaced. *Bingham* actually supports plaintiff's position.

In *Bingham,* the defendants were found liable for funneling millions of dollars in royalty payments through various schemes. Companies and contract rights were fraudulently transferred out of an estate to "facilitate the diversion of many royalty checks into defendants' bank accounts." *Bingham* 66 F.3d at 557. The jury found that the estate had actual knowledge that this diversion took place four years prior to suit, outside the window of time imposed by the federal RICO statute. *Id.* The *Bingham* panel found that the lower court correctly applied the separate accrual rule to allow recovery to injuries four years before the plaintiff filed suit.

The Bingham panel distinguished other cases where the damages to the plaintiff could be clearly ascertained because it suffered a single injury. *Compare Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988) (fraudulently concealed assets of the bankruptcy estate through a complicated series of transactions sufficient to trigger separate accrual rule), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989) *with Long Island Lighting Co. v. Imo Indus., Inc.,* 6 F.3d

876, 887 (2d Cir.1993). Cases where additional financial losses resulted from a single original injury would not give rise to the separate accrual rule. *Bingham* found, however, the proven violations at bar involved a continuing series of fraudulent actions undertaken to conceal assets and income. New injuries in that case were caused by a variety of schemes which were related only in their ultimate goal. *Id.* at 561. Plaintiff's action was thus timely with respect to all injuries that occurred within four years of the suit.

### B. *Application*

■■ As in *Bingham*, plaintiff has alleged a "continuing series of fraudulent actions" undertaken to deceive the public about the hazardous effects of its products. The evidence demonstrated that, like *Bingham*, defendants employed a variety of campaigns over a long period to this end. Evidence demonstrated various schemes to: utilize public relations fronts designed to distort the body of public knowledge of the health risks of smoking; maintain a scientific front for the purpose of funding evidence designed to discredit scholarship showing that smoking caused disease; refrain from conducting in house biological research that could lead to evidence condemning cigarettes as hazardous; and suppress the creation of less harmful products. *See* Part IV, *supra.* These deceptive operations took many forms and utilized many messages over the years.

The speculativeness involved in assessing how future damages will be manifest for this plaintiff, while not dispositive, favors treating continuing injuries as separate and independent for statute of limitation purposes. *Bingham,* 66 F.3d at 561 ("The speculative-versus-determinable language corresponds in practice to the underlying notion that a new and independent injury must occur to give rise to a

separately-accruing" violation); *see Blue Cross & Blue Shield of N.J., Inc.,* 2000 WL 1339554, at * 1. (denying some future damages as too speculative); *see also Bankers Trust,* 859 F.2d at 1104 ("[F]uture damages arising from defendants' conduct are unrecoverable if the fact of their accrual is speculative or the amount and nature unprovable. In such cases, refusal to award future damages as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. The cause of action for future damages, if they ever occur, will accrue only on the date they are suffered." (internal quotation marks and citations omitted)).

The resulting injuries to plaintiff over the years took, and will continue to take, many forms. Uncertainty as to the size and composition of the plaintiff's future pool of subscribers, the changing nature of defendants' fraud, the difficulty in forecasting future medical care costs, and the potential for vast restructuring of the national health delivery system through either private or governmental efforts make it impossible for the plaintiff to calculate future damages with any reasonable degree of certainty. *See generally* George J. Annas, Sylvia A. Law, Rand E. Rosenblatt, & Kenneth R. Wing, *American Health Law* ch. 2, at 121–64 (1990) (role and regulation of private third party payors in American healthcare system). Injuries resulting from defendants' actions, while designed to achieve a single end, were sufficiently independent to warrant the application of a separate accrual rule.

Defendants' statute of limitations claim is rejected.

### XII. Sufficiency of Damages

Defendants claim that sufficient evidence did not demonstrate a connection between the defendants' conduct and the

plaintiff's damages. Defendants' first claim—that plaintiff covered its smoking related costs by charging its customers premiums—was rejected in an earlier memorandum. *See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris Inc.,* 138 F.Supp.2d 357 (E.D.N.Y.2001). Defendants additionally claim that Dr. Harris's statistical model did not reflect the damages alleged. This claim is unfounded.

### A. *Law*

■■■■ A plaintiff's proof of amount of damages must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by defendants' delicts. Certainty in damage estimates is not required. *Blue Cross & Blue Shield of N.J., Inc.,* 36 F.Supp.2d at 585 (E.D.N.Y.1999) ("In any event, once the other elements of a cause of action have been proven, considerable leeway and flexibility in establishing damages is permitted."); *see also Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) ("the wrongdoers may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable"). Models must be sufficiently flexible for jurors to assess damages fairly and segregate between "damages attributable to lawful conduct and an unlawful scheme." *See Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1352 (9th Cir.1985) (court reversed jury award because of plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to [defendant's] unlawful scheme"). As the court of appeals has recently emphasized, the jury is free to believe some testimony and to not believe, or not rely upon other testimo-ny of the same or other witnesses. *See Girden v. Sandals Int'l.,* 262 F.3d at 197.

### B. *Application*

■■■■ Models segregated year-by-year damages flowing from an information effect and damages flowing from an innovation effect. Given the amount of damages the jury awarded, the jury might have entirely disregarded damages flowing from the innovation effect relied on by Dr. Harris.

The jury was properly instructed on the law of section 349. They were told in relevant part:

> In order to prove its claim under General Business Law Section 349, Empire must prove that the challenged acts or practices were misrepresentations and were misleading in a material way.
>
> "Misleading" means that the acts or practices must have been likely to mislead a reasonable consumer acting reasonably under the circumstances.
>
> "Misleading in a material way," means that the misrepresentations must be ones which would reasonably be expected to be important to a reasonable consumer in making his or her decision.
>
> In order to prove its claim under General Business Law Section 349, Empire must prove that it suffered actual injury as a result of smoking that was caused by the deceptive acts or practices of a defendant, or one acting within the scope of its agency as an agent of that defendant, causing damage to the health of a subscriber whose health care costs were paid by Empire. It need not show that Empire itself was deceived by the acts or practices of the defendant.

Trial Tr. at 8217–18.

Under the instructions, the jury could only award damages under section 349 for injuries that resulted from defendants'

misrepresentations during the relevant statute of limitations period. Plaintiff's model did not, nor because of the pervasiveness of the defendants' fraud could it, perfectly determine what the world would look like had the defendants not deliberately misled the public about its products. The assumptions developed in the Harris model were based on the conception that different information could "move" smoking rates. These assumptions were *Daubert* tested and approved.

Dr. Harris's reliance on case studies and other literature assessing the impact of communications which affirmatively discouraged smoking was reasonable in describing how initiation and quit rates of smokers would have changed had defendants not been deceptive. To the extent that Dr. Harris's separately accounted for damages that resulted from defendants' "gentlemen's agreement" not to innovate, the jury could find this evidence relevant to establishing defendants' overall intent to conceal the hazards of its products.

## XIII. Conclusion

Plaintiff shall receive post judgment interest from the time of the jury verdict to entry of judgment. Plaintiff shall submit a judgment in accordance with this memorandum.

The parties agree that a separate judgment for statutory attorney's fees and for costs under the Federal Rules of Civil Procedure may be entered after final judgment for the recovery awarded by the jury and interest.

SO ORDERED.